Dennis WEINHOLD and Ruth Weinhold, Appellees,

v.

Norman WOLFF and Pam Wolff, Appellants.

No. 94–1589.

Supreme Court of Iowa.

Oct. 23, 1996.

Rehearing Denied Nov. 18, 1996.

weeks as the disability bears to the body of the injured employee as a whole.

James A. Pugh, Lori L. Koop, and Edward G. Parker of Morain, Burlingame, Pugh & Koop, West Des Moines, and James W. Gailey, Newell, for appellants.

Willis J. Hamilton of the Hamilton Law Firm, P.C., Storm Lake, for appellees.

Eldon L. McAfee of Beving, Swanson & Forrest, P.C., Des Moines, for amicus curiae Iowa Pork Producers Association.

Christina L. Gault of the Iowa Farm Bureau Federation, West Des Moines, for amicus curiae Farm Bureau.

LAVORATO, Justice.

Landowners in close proximity to a commercial hog feeding and hog confinement facility sued the owner of the facility. The landowners alleged nuisance and negligence and prayed for damages and injunctive relief. The facility owner answered, asserted affirmative defenses, and counterclaimed. The parties tried the case to the court solely on the landowners' nuisance claim. Following trial, the district court concluded the landowners had proven the facility was a temporary nuisance.

Iowa Code section 352.11(1) (1993) grants a defense against nuisance suits to owners of farmland approved as agricultural land. The district court refused to apply section 352.11(1) to the unique facts of this case. The court concluded that section 352.11(1) would work an unconstitutional taking of the landowners' preexisting nuisance claim. (At the time the landowners filed this suit, section 352.11 was Iowa Code section 176B.11. Iowa Code chapter 176B became Iowa Code chapter 352 in 1993. The language in section 176B.11 originally appeared in the 1983 Iowa Code at section 93A.11. Section 93A.11 became section 176B.11 in 1987. Section 93A.11 was enacted in 1982. 1982 Iowa Acts ch. 1245, § 12. All references in this opinion will be to Iowa Code chapter 352 (1993).)

The court awarded the landowners $45,000 in damages for their pain and suffering, but refused to grant them injunctive relief. The damage award was in two parts. In part one, the court awarded the landowners $9000 for pain and suffering that occurred before the county approved the facility's land as an agricultural area. In part two, the court awarded the landowners $36,000 for pain and suffering that occurred after approval and through the end of trial. The facility owners appealed, and the landowners cross-appealed.

As discussed in detail in the analysis of these issues, we affirm as modified in part, reverse in part, and remand for further proceedings.

I. *Background Facts.*

In 1977 Dennis and Ruth Weinhold purchased about four acres of real property in Buena Vista County for $8000. They have lived on this acreage since the purchase. They raise various breeds of alternative livestock such as deer, emu, rhea, antelope, and occasionally, elk.

In February 1974 Norman and Pam Wolff purchased an eighty-acre tract of land approximately one-half mile directly south of the Weinholds' land. The Wolffs originally planted all the land with grain. Since November 1990 the Wolffs have operated a commercial hog feeding and confinement facility on part of this land, which they commute to from their home located about two and one-half miles away.

The facility is substantial and occupies about four acres of the eighty-acre tract. The Wolffs have run the facility at full capacity since its inception and finish about 2080 hogs per year. The building used to house the hogs is approximately forty-one feet by one hundred sixty-one feet. About 6256 square feet are devoted to hog production. The building runs east and west.

An integral part of the facility is a 500,000–gallon, uncovered, earthen, waste collection basin. The basin is located to the east of the building used to house the hogs. The basin is 130–feet long, 110–feet wide, and 14.5–feet deep.

The hogs are kept within pens located over a slatted floor. The waste falls through the slats and into two-foot pits underneath the hog confinement building. When waste accumulation in the pits reaches sixteen inches, a plug is pulled. The waste flows through an eight-inch diameter underground pipe east to the outside of the building where the waste enters the bottom of the earthen basin.

The pits are emptied every four weeks on an alternating basis. Each time the pits are emptied, about 10,000 to 15,000 gallons of waste are deposited into the basin. Twice a year, the waste is emptied from the basin and applied to area fields as fertilizer. This

waste is often applied to fields near the Weinholds' property.

In the fall of 1991, the Wolffs and several farmers neighboring the facility applied for an "agricultural area" designation for the land on which the facility sits. The Wolffs filed the application with the Buena Vista County Board of Supervisors pursuant to what is now Iowa Code section 352.6. The board approved the application on October 8. This was about a year after the Wolffs began the hog feeding and confinement operation.

## II. Background Proceedings.

On July 29, 1992, the Weinholds filed a two-count petition at law. Count I alleged the Wolffs' commercial hog feeding and confinement operation was a nuisance because it created noxious and offensive odors that pervaded the Weinholds' property. The Weinholds asked for money damages and injunctive relief to abate the nuisance. Count II alleged the noxious odors emanating from the Wolffs' hog feeding and confinement operation were the proximate result of the Wolffs' negligence. In this count, the Weinholds asked for money damages.

The Wolffs answered, denied liability, asserted an affirmative defense, and counterclaimed. The Wolffs asserted the affirmative defense under what is now Iowa Code section 352.11.

The Wolffs' counterclaim alleged the Weinholds' suit was frivolous and caused the Wolffs' mental anguish, inconvenience, and expense. The Wolffs asked for damages that would fairly compensate them for the harm resulting from the Weinholds' actions.

Although the case contained both legal and equitable issues, the parties agreed before trial to try the case in equity. During trial, the Weinholds withdrew their negligence claim. The Wolffs withdrew their counterclaim at the close of the evidence.

In their appeal, the Wolffs challenge the district court's finding that the facility (1) constituted a nuisance and (2) did not have the section 352.11 defense against nuisance suits. The Wolffs also challenge the damage award.

The Weinholds challenge the district court's finding that the nuisance was temporary and not permanent. The Weinholds also complain because the court did not award for (1) the diminished market value of their real property, (2) special damages occurring after trial, and (3) injunctive relief to abate the nuisance.

## III. Scope of Review.

 In Iowa, a party may sue to enjoin a nuisance and for damages either in equity or at law. *Friedman v. City of Forest City*, 239 Iowa 112, 119, 30 N.W.2d 752, 756 (1948). Whichever forum the plaintiff chooses, the plaintiff may obtain the same relief. *Id.* Where, however, the plaintiff seeks only monetary relief, the plaintiff is limited to a law action. *Id.* If the plaintiff chooses the law forum, the district court must still decide the appropriateness of injunctive relief. *Woody v. Machin*, 380 N.W.2d 727, 731 (Iowa 1986). In deciding the appropriateness of injunctive relief, the district court must make a comparative appraisal of all the factors in the case. *Id.*

Weinholds sued at law and asked for damages and injunctive relief. The case was therefore triable at law, but the appropriateness of injunctive relief was solely for the district court to decide. Because the parties agreed to try the case in equity, however, our review is not at law but de novo. *See* Iowa R.App.P. 4; *Kane v. City Council*, 537 N.W.2d 718, 721 (Iowa 1995). We give weight to the district court's findings of fact, but we are not bound by them. Iowa R.App.P. 14(f)(7). Even so, we are especially deferential to the district court's assessment of witness credibility. *Boekeloo v. Board of Review*, 529 N.W.2d 275, 276 (Iowa 1995).

## IV. The Issues.

A. *Nuisance.* The first issue we consider is whether the Wolffs' hog feeding and confinement operation was a nuisance.

1. *Applicable law.* Under Iowa Code section 657.1,

*[w]hatever is* injurious to health, indecent, or *offensive to the senses,* or an obstruction to the free use of property, *so as essential-*

ly to interfere with the comfortable enjoy-ment of life or property, is a nuisance, and a civil action by ordinary proceedings may be brought to enjoin and abate the same and to recover damages sustained on account thereof.

(Emphasis added.)

Additionally, under Iowa Code section 657.2,

[t]he following are nuisances: ... using any building or other place for the exercise of any trade, ... which, by occasioning noxious exhalations, offensive smells, or other annoyances, becomes injurious and dangerous to the health, comfort, or property of individuals....

These statutory provisions do not modify the common-law's application to nuisances. *Bates v. Quality Ready–Mix Co.*, 261 Iowa 696, 703, 154 N.W.2d 852, 857 (1967). These provisions are skeletal in form, and the courts look to the common law to fill in the gaps.

█ A private nuisance is "an actionable interference with a person's interest in the private use and enjoyment of the person's land." *Id.* Parties must use their own property in such a manner that they will not unreasonably interfere with or disturb their neighbor's reasonable use and enjoyment of the neighbor's property. *Id.*

█ Whether a lawful business is a nuisance depends on the reasonableness of conducting the business in the manner, at the place, and under the circumstances in question. *Id.* Thus the existence of a nuisance does not depend on the intention of the party who created it. *Patz v. Farmegg Prods., Inc.*, 196 N.W.2d 557, 561 (Iowa 1972). Rather, it depends on the following three factors: priority of location, the nature of the neighborhood, and the wrong complained of. *Id.* From this discussion it is clear that whether a party has created and maintained a nuisance is ordinarily a factual question. *Bates*, 261 Iowa at 704, 154 N.W.2d at 857.

█ A fact finder uses the normal person standard to determine whether a nuisance involving personal discomfort or annoyance is significant enough to constitute a nuisance.

*Patz*, 196 N.W.2d at 561. The normal-person standard is an objective standard and is explained in comment d to section 821F of the Restatement (Second) of Torts (1977):

When [an invasion] involves ... personal discomfort or annoyance, it is sometimes difficult to determine whether the invasion is significant [enough to constitute a nuisance]. The standard for the determination of significant character is the standard of normal persons or property in the particular locality. If normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable, then the invasion is significant. If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one, even though the idiosyncracies of the particular plaintiff may make it unendurable to him.

2. *The merits.* The Weinholds kept track of the times and characteristics of the odors from the Wolffs' facility by making entries on their wall calendar. The entries run from January 31, 1991, through December 1993. The Weinholds estimate they recorded all but about ten percent of the times either one detected odor from the facility.

█ The first entry—January 31, 1991—notes, "Wind out of the S. hog smell all day." The entries that follow describe the odor as "terrible," a "stink," and "strong." Some of the summer entries describes the smell as a "terrible stink." Other entries describe how the smell remains in the home all day. There are entries that describe the pair suffering stomach sickness, sneezing, headaches, sore throats, coughing, and tightness in the chest.

The calendar entries in July 1991 mention visitors to the home who experienced burning eyes and phlegmonous irritation. August entries reflect the Weinholds had trouble sleeping because of the odor. Toward the end of August the odor drove the couple from their home. They slept in their camper at their son's home to escape the odor. Their complaints continued through the trial date.

The odor problem is most persistent between March and October. During this time, the waste in the earthen storage basin is thawed and the prevailing wind is most often from the south. On a humid day, the south wind makes life at the Weinholds' home intolerable.

The wind, of course, shifts. So, not surprisingly, the Weinholds encounter the smell at various locations in a given day. Sometimes the smell invades their home and sometimes the smell is at other locations on their property.

During the winter, "crusting" on the surface of the basin—which cuts down the amount of odor escaping—has not been as effective as planned. The hog waste mixture freezes at a temperature lower than thirty-two degrees Fahrenheit. As mentioned, each month the Weinholds dump into the basin from 10,000 to 15,000 gallons of waste. When dumped during the winter, this waste has a temperature of sixty-two degrees Fahrenheit. The waste's temperature combined with warmer air temperatures causes the crust to form over only a small part of the basin's surface. This leaves the waste exposed and permits the waste odor to rise and be swept away by the prevailing wind.

The Weinholds and other witnesses said they can distinguish between an odor that comes from a more traditional hog operation with no outside waste storage and an odor that comes from a hog confinement operation with outdoor waste storage. They described the odor from the traditional operation as a "hog odor" or "normal hog smell." In contrast, they described the odor from the second type of operation as "pungent," "smells exactly like an open septic tank," "very, very nauseating," "a lot stronger than what I normally smell," "smells like a battery overcharged—kind of an acid smell," "a strong, repugnant odor." Some of the witnesses were at the Weinholds' home for business reasons and described terminating their visits abruptly because of the strong odor.

One witness who farms next to the Wolffs' eighty acres described the smell as a "lagoon odor" when the wind is in her direction. At times the odor was so strong that she and her husband would quit working and leave the fields. She described the odor as different from what she would ordinarily encounter near a traditional hog operation.

Many of the Weinholds' witnesses were born and raised on farms. Some were hog farmers. Others continue to be hog farmers. There was no evidence that any of them were other than persons of ordinary sensibilities.

As *Bates* holds, whether a business is a nuisance depends on three factors: priority of location, the nature of the neighborhood, and the wrong complained of. *Bates,* 261 Iowa at 704, 154 N.W.2d at 857.

In *Kriener v. Turkey Valley Community School District,* 212 N.W.2d 526, 530 (Iowa 1973), the landowners acquired their farm and located on it before an offending sewage lagoon was constructed. We found this fact weighed heavily in favor of the landowner on the nuisance issue. Here the Weinholds acquired their farm before the Wolffs started their hog feeding and confinement operation. The Weinholds therefore clearly enjoyed priority of possession.

The nature of the locality before the Wolffs started this operation was typical for rural Iowa. Although the locality was agricultural, it was also residential. As one court said,

> [t]he right to have air floating over one's premises free from noxious and unnatural impurities is a right as absolute as the right to the soil itself. Ordinarily, a legitimate business enterprise is not a nuisance per se, but may become a nuisance in fact by reason of the conditions implicit in and unavoidably resulting from its operation or because of the manner of its operation. The fact that a residence is in a rural area requires an expectation that the residence will be subjected to normal rural conditions, but not to such excessive abuse as to destroy the ability to live and enjoy the home, or such as to reduce the value of the residential property.

*Flansburgh v. Coffey,* 220 Neb. 381, 370 N.W.2d 127, 131 (1985) (dealing with whether hog confinement operation was a nuisance).

As to the wrong complained of, we agree with and adopt the following findings by the district court:

The court finds from the greater weight of the evidence that the Weinholds experience odors upon their property which are carried to it from the Wolffs' hog confinement facility and earthen basin approximately 100 times per year, commencing from January of 1991 to and including the last day of trial; that at least 50% of those times the odor would be strong enough in intensity to offend the senses of a person of ordinary or normal sensibility; that at least 25% of those occasions, or on about 25 days each year, the odor encountered by the Weinholds ... from the Wolffs earthen storage basin ... would have, at the Weinholds' location, been of such strength to be close to intolerable to a person of ordinary or normal sensibility; that especially the latter-described odor substantially interfered, on each occasion, with the Weinholds' right to utilize and enjoy their own property free of the unreasonable interference of odors emanating from the Wolffs' hog confinement facility and earthen waste storage basin.

Although the Wolffs were carrying on a lawful business in accordance with accepted standards, their operation constituted a nuisance. As we have held, "[a] lawful business, properly conducted, may still constitute a nuisance if [the business] interferes with another's use of his own property." *Valasek v. Baer*, 401 N.W.2d 33, 35 (Iowa 1987).

B. *Defense to nuisance suits provided by Iowa Code section 352.11(1).*

1. *Applicable law.* Iowa Code section 352.11(1) provides:

*Nuisance restriction.* A farm or *farm operation located in an agricultural area shall not be found to be a nuisance regardless of the established date of operation or expansion of the agricultural activities of the* farm or *farm operation.* The subsection does not apply if the nuisance results from the negligent operation of the farm or farm operation. *This subsection does not apply to actions or proceedings arising from injury or damage to person or property caused by the* farm or *farm operation*

*before the creation of the agricultural area.*

(Emphasis added.)

Under Iowa Code section 352.6, an agricultural area is created by the owner

submit[ting] a proposal to the county board for the creation of an agricultural area within the county.... The proposal shall include a description of the proposed area, including its boundaries. The territory shall be as compact and as nearly adjacent as feasible. Land shall not be included in an agricultural area without the consent of the owner. Agricultural areas shall not exist within the corporate limits of the city.... Agricultural areas may be created in a county which has adopted zoning ordinances. Except as provided in this section, the use of the land in agricultural areas is limited to farm operations.

2. *The merits.* The Wolffs maintain that the language of section 352.11(1) is clear on its face and requires no interpretation by us. The statute, they say, prohibits any award for damages for nuisance actions after the affected property has been included in an agricultural area as defined by section 352.6.

The Wolffs do not dispute that the district court's $9000 award to the Weinholds for special damages occurring before October 8, 1991, was proper. (On October 8, 1991, the county board of supervisors approved the Wolffs' property as an agricultural area.)

The Wolffs do, however, contend the $36,000 award for special damages occurring on and after October 8, 1991, was improper. The $36,000 award is improper, the Wolffs assert, because those damages occurred after the county had approved the Wolffs' property as an agricultural area. The Wolffs insist the legislature intended that a party should not recover for nuisance damages which occur after the county has approved the property as an agricultural area.

The Weinholds agree section 352.11(1) is clear on its face, but they argue the statute plainly favors their claim. The Weinholds contend their nuisance action arose out of "injury created and damage sustained" before the county approved the Wolffs' property as an agricultural area. In short, the

Weinholds rely on the following language in section 352.11(1): "This subsection does not apply to actions or proceedings arising from injury or damage to person or property caused by the farm or farm operation before the creation of the agricultural area."

Section 352.11(1) is a "right to farm" law designed to protect agricultural operations by giving those operations meeting the statutory requirements a defense to nuisance actions. *See* Neil D. Hamilton, *A Livestock Producer's Legal Guide to: Nuisance, Land Use Control, and Environmental Law* 21 (1992). All fifty states have enacted right to farm laws in various forms. *Id.*

Negligent operation of the farm resulting in the nuisance defeats the defense. Additionally, the defense does not apply to actions or proceedings arising from injury or damage to property caused by the farm operation *before* the agricultural area is established.

Our interpretation suggests that the legislature has determined that farming operations like the Wolffs' are sufficiently important to the state to warrant protective state laws like section 352.11(1). The practical effect of these laws, of course, is to limit the ability of persons affected by the operation to sue operators for nuisance.

The purpose clause of Iowa Code chapter 352 supports our interpretation. *See* Iowa Code § 352.1. Section 352.1 states in pertinent part:

> The general assembly recognizes the importance of preserving the state's finite supply of agricultural land. Conversion of farmland to urban development, and other nonfarm uses, reduces future food production capabilities and may ultimately undermine agriculture as a major economic activity in Iowa.
>
> It is the intent of the general assembly to provide local citizens and local governments the means by which agricultural land may be protected from nonagricultural development pressures. This may be accomplished by . . . establishment of agricultural areas in which substantial agricultural activities are encouraged, so that land inside these areas . . . is conserved for the production of food, fiber, and live-

stock, *thus assuring the preservation of agriculture as a major factor in the economy of this state.*

(Emphasis added.)

The problem in this case is that the Wolffs started their operation about a year before their land was approved as an agricultural area. As we see it, the parties' contentions are resolved by whether the nuisance was permanent or temporary. Before beginning our analysis, we need to distinguish between these types of nuisances.

The distinction has been explained this way:

> An action in damages may be maintained for the creation of a nuisance and a subsequent and separate action may be maintained for the continuance of such nuisance. The determination of whether a single right of action or successive rights are created by a nuisance for damages depends primarily upon whether the cause of injury is permanent or temporary. The nature of the damages, as being temporary or permanent, is determined by the character of the nuisance to which the land is subjected and not by the quantity of resultant damages. The question generally is one of fact for the jury.
>
> If injuries from a nuisance are of a permanent character and go to the entire value of the estate, there can be but one action, and all damages—past, present, and future—are recoverable therein; in such a case, one recovery is a grant or license to continue the nuisance, and there can be no second recovery for its continuance. Stated otherwise, damages for permanent nuisances are not dependent upon any subsequent use of the property but are complete when the nuisance comes into existence. . . .
>
> Where the injury from the alleged nuisance is temporary in its nature, or is of a continuing or recurring character, the damages are ordinarily regarded as continuing, and one recovery against the wrongdoer is not a bar to successive actions for damages thereafter accruing from the same wrong. In such a case, every day's continuance is a new nuisance. That is, each repetition of the nuisance creates

further liability, and gives rise to a new cause of action. If the nuisance does not involve the entire destruction of the estate or its beneficial use, but may be apportioned from time to time, separate actions must be brought for each recurring injury, and recovery may be had for damages sustained within the period of the statute of limitations applicable to the action. That is, where a nuisance is temporary, damages to property affected by the nuisance are recurrent and may be recovered from time to time until the nuisance is abated.

A temporary nuisance may in some circumstances give rise to permanent damages, as well as temporary damages.

. . . .

The rule applicable where the nuisance is permanent has been applied in cases where the court does not deem it just and equitable to order the thing which causes the injury to be removed, although it is removable, since, under such circumstances, the plaintiff must in one action recover his damages and the defendant must pay all the damages suffered, both past and present, unless the defendant removes the thing before the time of trial, in which case damages are recoverable only up to the time of such removal.

58 Am.Jur.2d *Nuisances* §§ 273–75 (1989).

■■■ For reasons that follow, we think—contrary to the district court—the *unique* facts of this case dictate that we consider the nuisance permanent. We characterize the facts here as unique to emphasize that .

[t]he terms "permanent" and "temporary" are somewhat nebulous in that they have practical meaning only in relation to particular fact situations and can change in characterization from one set of facts to another.

*Mel Foster Co. Properties v. American Oil Co.*, 427 N.W.2d 171, 175 (Iowa 1988) (quoting Note, *Stream Pollution—Recovery of Damages*, 50 Iowa L.Rev. 141, 153 (1964); holding that chemical contamination of land encompassed aspects of both a temporary and permanent nuisance; injury was temporary in the sense that the cause of pollution had been discovered and abated, and harmful

effects would eventually dissipate; injury was permanent in the sense that it constituted damage to ground itself and would continue for an indefinite but significant period of time; court used measure of damages applicable to permanent nuisance).

First, there is no record evidence that, short of shutting down the operation, the Wolffs can or will abate the nuisance in the future. The district court speculated that technology would eventually solve the odor problem. There was, however, no record evidence that odor control breakthroughs were near. A knowledgeable expert in this area testified that more research was necessary on how to detect and control odor.

Mr. Wolff testified he used an odor control additive in the waste basin. He also testified, however, that he stopped using the additive because the additive was ineffective.

The engineer who designed the waste system for the Wolffs offered no evidence that there were any technological breakthroughs on the horizon to control odor.

We agree with the Weinholds' assessment of the district court's finding on this issue: "The court's rationale that the nuisance was not permanent due to rapidly developing technology that would 'hopefully' aid in the control of odor was unsupported by anything other than wishful thinking."

Moreover, the Wolffs offered no evidence that they intended to cease the operation in the foreseeable future. The evidence, in fact, points the other way because the Wolffs built the waste basin with the capacity to double its current holdings. *See Mel Foster Co. Properties*, 427 N.W.2d at 175 (permanent in legal sense does not mean forever—indefinitely long is sufficient); *Patz*, 196 N.W.2d at 562 (permanent easement is one of such character that it will be reasonably certain to continue in the future).

Second, we can abate the odor by ordering closure of the earthen basin. This is not an equitable and practical solution because our closure order would result in closing the whole operation. *See* 58 Am.Jur.2d *Nuisances* § 275 ("The rule applicable where the nuisance is permanent has been applied in

cases where the court does not deem it just and equitable to order the thing which causes the injury to be removed, although it is removable...."). In addition, such a result would be contrary to the spirit and purpose of chapter 352.

Last, without the removal order, the Wolffs would have, in effect, a license to continue the nuisance. *See* 58 Am.Jur.2d *Nuisances* § 274. Because of the section 352.11(1) defense against nuisance suits, the Weinholds would have no corresponding right to recover for the continuing nuisance. In these unique circumstances, equity dictates that the Weinholds recover in this action all of their past, present, and future damages. *See Wesley v. City of Waterloo,* 232 Iowa 1299, 1303, 8 N.W.2d 430, 432 (1943) (in the case of a permanent nuisance, plaintiff may maintain only one action; plaintiff is therefore allowed to recover all damages—past, present, and future—in the one action).

■ We reach the critical issue in this case: Did the legislature intend to cut off the Weinholds' cause of action to recover damages because of a permanent nuisance? We think not. Our conclusion is borne out by the plain language of section 352.11(1). As mentioned, section 352.11(1) gives owners of operations within approved agricultural areas a defense against nuisance suits. The defense does not, however, "apply to *actions* or proceedings *arising* from injury or damages to person or property caused by the ... farm operation *before* the creation of the agricultural area." Iowa Code § 352.11(1) (emphasis added).

■ Iowa Code section 352.2(9) defines "nuisance action or proceeding" to mean "an *action,* claim, or proceeding, whether brought at law, in equity, or as an administrative proceeding, which is based on *nuisance.*" (Emphasis added.) An "action" in its usual legal sense means "a lawsuit brought in a court; ... [t]he legal and formal demand of one's right from another person or party made and insisted on in a court of justice." Black's Law Dictionary 28 (6th ed. 1990). The Weinholds' lawsuit meets the definition of "nuisance action" in section 352.2(9). This lawsuit is an action because

they brought it in a court and are demanding their right to relief for damages from the Wolffs. Additionally, the Weinholds' lawsuit is based on nuisance.

■ Under Iowa law, causes of actions accrue when the wrongful act produces loss or damage to the claimant. *McKiness Excavating & Grading, Inc. v. Morton Bldgs., Inc.,* 507 N.W.2d 405, 408 (Iowa 1993). Here the nuisance created by the Wolffs' operation caused the Weinholds damage long before the county approved the Wolffs' land as an agricultural area. Because the nuisance is a permanent one, the Weinholds' damages were complete at the time the nuisance arose. This is so because a permanent nuisance "contemplates that [the nuisance] is at once necessarily productive of all the damages that can ever result from it." *Patz,* 196 N.W.2d at 562 (citation omitted). *See also Wesley,* 232 Iowa at 1303, 8 N.W.2d at 432 (in the case of a permanent nuisance, plaintiff may maintain only one action; plaintiff is therefore allowed to recover all damages—past, present, and future—in one action).

We have held that we should not construe a statute "as taking away common law rights existing at the time of enactment unless that result is imperatively required." *Ford v. Venard,* 340 N.W.2d 270, 273 (Iowa 1983) (citation omitted). Our interpretation that section 352.11(1) does not take away the Weinholds' nuisance action is consistent with this rule of statutory construction.

Moreover, we see evidence in Iowa Code chapter 352 to support our interpretation. Iowa Code section 352.6(1)(a) provides that "nonconforming preexisting residences may be continued in residential use" in an approved agricultural area. So not only was the legislature concerned about conserving farmland for agricultural purposes, it was also concerned about preserving private residential property. Our interpretation allowing the Weinholds to recover all of the damages they are entitled to strikes a balance between these two competing interests. Finally, our interpretation would not affect the overall legislative scheme in chapter 352 because, as the Weinholds point out, it is unlikely that many hog farms are nuisances

before farmland is approved as an agricultural area.

 We hold therefore that section 352.11(1) did not afford the Wolffs a defense to the Weinholds' nuisance action for past, present, and future damages.

### C. *Damages.*

1. *Applicable law.* When the nuisance is permanent, the proper measure of damages is the diminution in the market value of the property. 58 Am.Jur.2d *Nuisances* § 289 (1989); *Mel Foster Co. Properties,* 427 N.W.2d at 175. The diminution in value refers to "the diminution of the market value of the property for any use to which it might be appropriated, and not merely its diminution in value for the purpose to which the plaintiff dedicated it." 58 Am.Jur.2d *Nuisances* § 289. This measure of damages compensates the injured landowner for an interference that is tantamount to a permanent taking. *Sundell v. Town of New London,* 119 N.H. 839, 849, 409 A.2d 1315, 1321 (1979).

 Where the nuisance is permanent, the landowner may also recover such other special damages the landowner can prove. 58 Am.Jur.2d *Nuisances* § 293 (1989). The rule is that

in addition to depreciation in the market ... value of the realty, the plaintiff may recover the damages he himself suffers from deprivation of the comfortable enjoyment of his property, and the inconvenience and discomfort suffered by himself and his family, or other affected persons.

The personal inconvenience, annoyance, and discomfort to a property owner or occupant caused by a nuisance is a separate and distinct element of damage, and thus, damages for personal inconvenience, annoyance, and discomfort caused by the existence of a nuisance are separately and independently recoverable in a nuisance action in addition to, or separate from, damages suffered in respect of the market value of the premises, or injuries to or destruction of buildings and crops resulting from a permanent nuisance. . . .

58 Am.Jur.2d *Nuisances* § 296 (1989); *accord Miller v. Town of Ankeny,* 253 Iowa 1055, 1062, 114 N.W.2d 910, 914 (1962).

 Special damages in nuisance cases are not subject to any precise rule for ascertaining damages because these damages are not susceptible of exact measurement. *Kriener,* 212 N.W.2d at 536. Like the intangible damages in personal injury cases, the factfinder must use its sound judgment based upon an impartial consideration of the evidence. *Id.* If therefore there is any reasonable basis in the record to support the award, we will not disturb it. *Kriener,* 212 N.W.2d at 537.

2. *The merits as to special damages.* The Weinholds contend the district court properly awarded them $45,000 ($22,500 to each) for special damages through trial. But the Weinholds contend the district court should have awarded them future damages in addition. They ask us to remand this case to allow the district court to decide what, if any, future damages should be awarded.

 The Wolffs challenge this award on two grounds. First, they contend the Weinholds must show the personal inconvenience, annoyance, discomfort, and loss of full enjoyment of the property are attributable to a physical injury. The Wolffs insist that a medical expert must confirm that these complaints are tied to the physical injury. They assert there was no such showing or confirmation.

Second, the Wolffs contend the personal inconvenience, annoyance, discomfort, and loss of full enjoyment of the property are not elements of damage in a nuisance action. Rather they are simply seen as factors in determining whether a nuisance exists.

The district court characterized the special damages as "physical and mental pain and suffering the latter of which includes mental anguish and loss of enjoyment of life by reason of not being able to use their property free of unreasonable intrusion of livestock odor." The district court's characterization of the special damages is broad enough to include the complaints here of personal inconvenience, annoyance, discomfort, and loss of full enjoyment of the property caused by

the offensive odor. The district court awarded the Weinholds $45,000 in special damages through trial. The court did not award future special damages because it considered the nuisance temporary.

The Weinholds argue that they are entitled to special damages they are likely to incur in the future because of the offensive odor. We agree because we find the nuisance is permanent. *See Wesley*, 232 Iowa at 1303, 8 N.W.2d at 432. We find, however, that $45,000 is warranted to compensate the Weinholds for all damages of this sort—past, present, and future.

We think the $45,000 award is adequate and not excessive, considering what the Weinholds have endured and will continue to endure. At least fifty days of each year the smell was strong enough to offend senses of normal sensitivity. And at least twenty-five days each year the smell was so strong that it was close to intolerable.

At times the smell interfered with the Weinholds' sleep. And on occasions the smell was so strong that it drove them from their home in the middle of the night to seek sleep and rest elsewhere.

Often the smell caused the Weinholds to experience stomach sickness, continuous sneezing, headaches, tightness in the chest, and sore throats. The symptoms would subside only when the wind changed direction. Visitors to the Weinholds would experience the same symptoms.

Based on the record evidence, we see no likelihood that these complaints will abate in the future.

We reject the Wolffs' contention that to be compensable the special damages had to be attributable to a physical injury and had to be medically confirmed. Our nuisance cases make no such requirement. *See Acadia, California Ltd. v. Herbert*, 54 Cal.2d 328, 337, 5 Cal.Rptr. 686, 691, 353 P.2d 294, 299 (1960) (regardless of whether a landowner sustains a physical injury, the landowner may recover for discomfort and annoyance and for mental suffering proximately caused by nuisance). *Cf. Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 526 (Iowa 1990) (civil rights complainant

allowed to recover compensable damages for emotional distress without a showing of physical injury); *Duncanson v. City of Fort Dodge*, 233 Iowa 1325, 1328, 11 N.W.2d 583, 585 (1943) (in nuisance action court rejected requirement that plaintiff had to present evidence of expenses connected with an alleged sickness or discomfort; verdict of $1200 upheld for nausea, inconvenience, and discomfort from odors produced from defendant's sewage plant).

We likewise reject the Wolffs' contention that the annoyance, discomfort, and loss of full enjoyment of the property are not elements of a nuisance action warranting compensation. Our case law is clear that these are elements of damages to be separately compensated. *See, e.g., Miller*, 253 Iowa at 1062, 114 N.W.2d at 914; Tracy A. Bateman, Annotation, *Nuisance as Entitling Owner or Occupant of Real Estate to Recover Damages for Personal Inconvenience, Discomfort, Annoyance, Anguish, or Sickness, Distinct from, or in Addition to, Damages for Depreciation in Value of Property or Use*, 25 A.L.R.5th 568, § 2[a], at 589 (1994).

3. *The merits as to diminution of market value.* The Weinholds think they are also entitled to diminution in market value damages because the nuisance is permanent. The district court awarded the Weinholds no diminution of market value damages. The reason, we assume, is because the court found the nuisance was temporary rather than permanent. Because we conclude otherwise, we remand to allow the district court to determine what, if any, diminution of market value damages it should allow the Weinholds. The court shall make that determination based on the present record. *See In re Marriage of Bergfeld*, 465 N.W.2d 865, 871 (Iowa 1991) (appellate court may—in appropriate circumstances—remand in equity cases for further proceedings).

D. *Injunctive relief: whether the district court should have granted injunctive relief and ordered abatement of the nuisance.*

1. *Applicable law.* In determining whether to grant injunctive relief to abate a

nuisance, courts employ a balancing test incorporating the following factors:

(a) the character of the interest to be protected,

(b) the relative adequacy to the plaintiff of injunction and of other remedies,

(c) plaintiff's delay in bringing suit,

(d) plaintiff's misconduct,

(e) the relative hardship likely to result to defendant if injunction is granted and to plaintiff if it is denied,

(f) the interests of third persons and of the public, and

(g) the practicality of framing and enforcing the order or judgment.

*Helmkamp v. Clark Ready Mix Co.*, 214 N.W.2d 126, 130 (Iowa 1974). The decision is a judgment call. *Id.*

2. *The merits on the injunctive relief issue.* The final issue concerns whether the district court should have granted the Weinholds injunctive relief and ordered an abatement of the nuisance. The Weinholds contend the court should have. The Wolffs, of course, contend otherwise.

█ In applying the balancing factors in *Helmkamp,* we conclude we should deny the Weinholds injunctive relief. We do so for the following reasons.

First, we have already determined that the Weinholds should have special damages. Additionally, the district court may on remand award damages to the Weinholds for diminution of the market value of their property. We think such damages provide the Weinholds an adequate remedy.

Second, as we mentioned, to abate the nuisance, we would need to order removal or closure of the basin. As we also mentioned, this is not an equitable and practical solution because such relief would result in closing the operation. Closing the operation would be contrary to the spirit and purpose of Iowa Code chapter 352.

Last, because closing the operation would be contrary to the legislature's goal of protecting farming operations, the public's interest is directly implicated.

V. *Disposition.*

In summary, we conclude as follows. First, the Wolffs' facility constitutes a nuisance. Second, contrary to the district court's finding, the nuisance is permanent rather than temporary. Third, Iowa Code section 352.11(1) afforded the Wolffs no defense to the Weinholds' nuisance action. Fourth, we award the Weinholds $45,000 for all past, present, and future special damages. This is in contrast to the district court's award of $45,000 for such damages through the trial date. Fifth, the district court on remand shall determine on the record the amount, if any, the Weinholds shall receive for diminution in market value of their land. Last, we refuse to grant the Weinholds any injunctive relief.

In view of the above conclusions, we need not address other issues raised by the parties.

We therefore affirm as modified in part, reverse in part, and remand for further proceedings.

**AFFIRMED AS MODIFIED IN PART; REVERSED IN PART; REMANDED FOR FURTHER PROCEEDINGS.**

All justices concur except ANDREASEN, NEUMAN, and TERNUS, JJ., who concur in part and dissent in part.

ANDREASEN, Justice, concurring in part, dissenting in part.

I concur in the majority opinion except for division IV(C)(3) from which I dissent.

I agree diminution in market value damage is recoverable in permanent nuisance cases. However, in this case, Weinholds have failed to prove these damages. At trial Dennis Weinhold testified:

Q. Do you have an opinion, sir, what the value of your property would be without the smell? A. I think I stated in depositions in September, $40,000. Since then we've still built more pens since then. And that was approximately a year ago. So I assume the property values went up.

Q. With the smell, sir, what do you think you could sell your property for today? Or do you think you could sell it? A. If

you can't get a friend to sit there and talk to you because of the stink, he's got to leave, I don't see how you could get anything out of the property trying to sell it to somebody who's going to spend their life there. I consider it worthless on the days that it stinks.

Q. Well then do you believe the fair market value at the present time would be zero? A. I believe so, yes.

The testimony that the fair market value is zero does not satisfy the plaintiffs' requirement to prove their diminution of market value damages. *See Boekeloo v. Board of Review,* 529 N.W.2d 275, 278–79 (Iowa 1995).

NEUMAN and TERNUS, JJ., join this partial concurrence and partial dissent.