Daniel MARTINS and Coleen
Martins, Appellees,

v.

INTERSTATE POWER COMPANY,
Appellant.

No. 00–0791.

Supreme Court of Iowa.

Oct. 9, 2002.

Rehearing Denied Nov. 7, 2002.

**658**

Sheila Stuart Kelley and Christopher D. Stombaugh of Kopp, McKichan, Geyer & Skemp, L.L.P., Platteville, Wisconsin, Scott Lawrence of Lawrence & Desrochers, St. Nazianz, Wisconsin, and R. Craig Oppel of Allbee, Allison, & Denning, P.C., Muscatine, for appellees.

David L. Hammer, Angela C. Simon and Scott J. Nelson of Hammer, Simon & Jensen, Dubuque, for appellant.

Michael R. May, Ankeny, for amicus curiae Iowa Association of Municipal Utilities and Dennis Puckett of Sullivan & Ward, P.C., Des Moines, for amicus curiae Iowa Association of Electric Cooperatives.

LAVORATO, Chief Justice.

The district court entered judgment on a jury verdict in favor of Daniel Martins and Coleen Martins against Interstate Power Company (Interstate). We transferred the case to the court of appeals and that court affirmed. We granted Interstate's application for further review. On further review, we consider one issue: Whether the district court erred in submitting a "pure nuisance" claim without an accompanying negligence claim in a stray voltage case against an electric utility. Finding no error, we affirm the court of appeals decision and the judgment of the district court.

## I. Background Facts and Proceedings.

From 1982 to March 1, 1997, Daniel Martins milked cows on a dairy farm just outside the city limits of Monona, Iowa. Daniel and Coleen were married in 1986. The Martins purchased the dairy farm from a finance company in 1991. Before that, Daniel's parents owned the farm. A dairy barn was built on the property in 1977. An Interstate substation sits less than a quarter mile to the west of the Martins' farm. The farm is between the city and the substation.

In March 1989, the Martins notified Interstate that they believed stray voltage

was accessing their cows. Interstate investigated and attributed any problems to the Martins' own wiring on the farm.

In 1992, the Martins again notified Interstate that they believed stray voltage was accessing their cows. This was after Daniel received an electric shock from the bulk tank and off the barn steel. Field representatives from a dairy to which the Martins sold milk found excessive alternating current from the utility at cow contact points in the barn. Interstate conducted more testing and made some recommendations, but insisted that the stray voltage was not caused by its lines.

In April 1993, at the Martins' request, Interstate isolated the neutrals, which involves separating the farm neutral from the utility neutral (separating the Martins' and Interstate's electrical systems). Testing after the isolation confirmed there was no stray voltage.

In the early 1990s, Daniel first reported problems typically associated with stray voltage to his veterinarian. The veterinarian described the Martins' herd as "unruly" and characterized by "bad behavior." For example, cows would kick off their milkers, kick at their stomach, swing from side to side, and "do a lot of dancing." Cows were frightened and would not enter the barn.

After Interstate isolated the neutrals in 1993, the Martins' veterinarian noted that "the cow behavior instantly turned around, it was just like day and night." The cows began chewing their cuds and "appeared to be more comfortable in the barn." They started putting on weight and looked better. The somatic cell count dropped dramatically, and milk production increased.

In 1995 and 1996, however, the cows' behavior and condition began to deteriorate again. The Martins noticed abnormal behavior in the cows, and the somatic cell counts started increasing.

Sometime between 1985 and 1990, the local gas company found alternating current on the gas line at the Martins' dairy farm. In 1996, after more testing revealed the same problem, the gas company replaced the steel gas line with a plastic line.

In November 1996, the Martins filed this lawsuit against Interstate, seeking damages allegedly caused by stray voltage. The petition alleged four theories of liability: strict liability, negligence, nuisance, and trespass. Interstate denied the allegations and raised the affirmative defense of comparative fault.

Several months after this lawsuit was filed, the Martins' veterinarian advised them to move the herd off their farm. In March 1997, the Martins moved the herd to a farm four miles north. Cow behavior improved at the new location.

Meanwhile, in February 2000, the Martins voluntarily dismissed the strict liability, negligence, and trespass counts, proceeding solely on the nuisance count.

Following this dismissal, Interstate filed a motion for summary judgment as to the nuisance count. The district court denied the motion, and we denied Interstate's application for permission to appeal in advance of final judgment.

Thereafter the matter proceeded to trial. The jury returned a verdict in favor of the Martins for $700,000. Following Interstate's appeal, we transferred the case to the court of appeals, which affirmed. We then granted Interstate's application for further review.

## II. Issues.

Interstate raised numerous issues on appeal. We address only one: whether the district court erred by applying a "pure nuisance" claim against the utility without

an accompanying negligence claim. We conclude the court of appeals adequately addressed and correctly decided the issues we do not address.

## III. Pure Nuisance Versus Nuisance With Accompanying Negligence Claim.

**A. Generally.** Iowa Code section 657.1 defines nuisance and provides for civil remedies:

Whatever is injurious to health, indecent, offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and a civil action by ordinary proceedings may be brought to enjoin and abate the same and to recover damages sustained on account thereof.

Iowa Code § 657.1 (1995). Iowa Code section 657.2 lists certain conduct or conditions deemed to be a nuisance.

The statutory definition of nuisance does not modify application of common law to nuisances. *Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 314 (Iowa 1998). "Rather, the statutory provisions 'are skeletal in form, and [we] look to the common law to fill in the gaps.'" *Id.* (quoting *Weinhold v. Wolff*, 555 N.W.2d 454, 459 (Iowa 1996)).

A private nuisance is "an actionable interference with a person's interest in the private use and enjoyment of the person's land." *Weinhold*, 555 N.W.2d at 459 (citation omitted). "Parties must use their own property in such a manner that they will not unreasonably interfere with or disturb their neighbor's reasonable use and enjoyment of the neighbor's property." *Id.*

A public nuisance, the other form of nuisance, is "a species of catchall criminal offenses, consisting of an interference with the rights of the community at large." *Guzman v. Des Moines Hotel Partners, L.P.*, 489 N.W.2d 7, 10 (Iowa 1992). Examples include anything from the obstruction of a highway to a public gaming house or indecent exposures. *Id.* Here we are dealing with a private nuisance.

Whether a lawful business is a private nuisance

depends on the reasonableness of conducting the business in the manner, at the place, and under the circumstances in question. Thus, the existence of [such] a nuisance does not depend on the intention of the party who created it. Rather, it depends on the following three factors: priority of location, the nature of the neighborhood, and the wrong complained of.

*Weinhold*, 555 N.W.2d at 459 (citations omitted). Whether a party has created and maintained a nuisance is ordinarily a fact question. *Id.*

There is a distinction between the concepts of "nuisance" and "negligence," which we explained in *Bormann:*

Negligence is a type of liability-forming conduct, for example, a failure to act reasonably to prevent harm. In contrast, nuisance is a liability-producing condition. Negligence *may or may not* accompany a nuisance; negligence, however, is not an essential element of nuisance. If the condition constituting the nuisance exists, the person responsible for it is liable for resulting damages to others even though the person acted reasonably to prevent or minimize the deleterious effect of the nuisance.

*Bormann*, 584 N.W.2d at 315 (emphasis added) (citations omitted); *see also* 58 Am. Jur.2d *Nuisances* § 9, at 676 (1989) (The tort concepts of negligence and nuisance "describe completely distinct concepts, which constitute distinct torts, different in

their nature and their consequences.... [N]egligent acts do not, in themselves, constitute a nuisance; rather negligence is merely one type of conduct upon which liability for nuisance may be based, and thus, negligence is not a necessary ingredient of a nuisance.") In other words, nuisance simply refers to the results; negligence *might* be the cause. *Guzman*, 489 N.W.2d at 11.

■ The true distinction between negligence and nuisance is that "to constitute a nuisance 'there must be a degree of danger (likely to result in damage) *inherent* in the thing itself, beyond that arising from mere failure to exercise ordinary care in its use.'" *Id.* (emphasis added) (citations omitted).

■ Where a nuisance is based on negligence, however, liability for nuisance may depend upon the existence of negligence. *Id.* Where that is the case, apportionment of fault principles under Iowa Code chapter 668 apply. *Id.;* see also *58 Am.Jur.2d Nuisances* § 82, at 735 ("[W]henever a nuisance has its origin in negligence, negligence must be proven, and the plaintiff may not avert the consequences of contributory negligence by affixing to the negligence of the wrongdoer the label of nuisance.").

**B. Stray voltage.** One court has described the concept of stray voltage this way:

In order to understand stray voltage or neutral-to-earth voltage, one must first understand the neutral-grounded network. All electricity leaving an electrical substation must return to that substation in order to complete a circuit. Unless that circuit is completed, electricity will not flow. The current leaves the substation on a high voltage line which eventually connects to some electrical "appliance." After exiting the "appliance" that current must return to the substation. The neutral-grounded network provides the returning current two choices. Either it can return via the neutral line, which accounts for the second wire on our electrical poles, or it can return through the ground. These two pathways comprise the grounded-neutral network. Electricity flows through the path of lowest resistance. If there exists more resistance in the neutral line than in the ground, the current will flow through the ground to return to the substation.

Neutral-to-earth voltage or stray voltage will occur when current moves from either the neutral line to the ground or from the ground to the neutral line. It uses a cow as a pathway if that animal happens to bridge the gap between the two. A cow's hooves provide an excellent contact to the earth while standing on wet concrete or mud, while at the same time the cow is contacting the grounded-neutral system consisting of items such as metal stanchions, stalls, feeders, milkers, and waterers. The current simply uses the cow as a pathway in its eventual return to the substation. Apparently very slight voltages can affect cattle. Evidence [has] suggested anything greater than one volt can be catastrophic to a dairy farm.

*Larson v. Williams Elec. Coop., Inc.*, 534 N.W.2d 1, 1–2 n. 1 (N.D.1995) (farmer brought action against electric cooperative seeking recovery of damages to dairy farm allegedly caused by stray voltage); *see also* Peter G. Yelkovac, *Homogenizing the Law of Stray Voltage: An Electrifying Attempt to Corral the Controversy*, 28 Val. U.L.Rev. 1111, 1117–19 (Spring 1994) [hereinafter Yelkovac].

A cow in contact with stray voltage experiences a slight electrical shock, and repeated exposure to these slight shocks causes a cow to develop severe behavioral and physiological problems "rendering the

cow a much less-effective milk producer." Yelkovac at 1111. Yelkovac suggests that the sources of stray voltage most often stem from problems in an electrical provider's transmission and distribution system or in a farmer's wiring or equipment, or from a combination of problems in the electrical systems of both the provider and farmer. *Id.* at 1112. The writer also suggests that "[s]ome stray voltage may always be present as an *inherent* part of supplying electricity; however, problems in the electrical systems can elevate the levels of voltage to an undesirable level, causing an electrical current to flow through the cattle and into the ground or earth." *Id.* at 1112–13 (emphasis added).

One method of controlling stray voltage, known as "isolation" (and attempted by Interstate in this case)

> mitigates the effects of stray voltage by preventing the voltage from reaching the cattle. Essentially, the most effective type of isolation involves the separation of the primary and secondary neutral wires so that the stray voltage cannot flow as easily into the farmer's electrical system from the power provider's system.

*Id.* at 1120.

**C. Treatment of stray voltage claims in cases from other jurisdictions.** Cases addressing the stray voltage issue are not consistent. As Yelkovac points out,

> [t]he body of law on the subject [of stray voltage], . . . lacks the uniformity that this highly technical area demands. For example, courts differ in their pronouncements of the duty owed by power providers to their dairy farm customers regarding stray voltage and in their willingness to allow strict products liability as a cause of action in stray voltage suits. Because of the lack of uniformity in this area, the law fails to address

properly an inherently technical problem such as stray voltage. The disparate standards of care essentially ensure that a farmer's chance of recovery in a negligence action depends to a large degree upon the farm's location within a particular state. Moreover, the availability of a cause of action sounding in strict products liability facilitates the farmer's recovery by obviating the need for the farmer to demonstrate fault on the part of the power provider. Farmers in states that do not recognize this cause of action in stray voltage cases face greater difficulty in recovering under fault-based, negligence theories.

*Id.* at 1116. Interestingly, the writer does not discuss the application of nuisance theory to stray voltage cases. Rather, he limits his discussion to negligence and strict liability theories of recovery. He suggests a uniform treatment of stray voltage cases that would define the standard of care and prohibit the use of strict products liability theory against power providers. *Id.* at 1154–58.

Courts have decided several stray voltage cases grounded on nuisance. *See, e.g., Jackson County Hog Producers v. Consumers Power Co.,* 234 Mich.App. 72, 592 N.W.2d 112 (1999); *Kuper v. Lincoln–Union Elec. Co.,* 557 N.W.2d 748 (S.D.1996); *Kaech v. Lewis County Public Util. Dist. No. 1,* 106 Wash.App. 260, 23 P.3d 529 (2001); *Vogel v. Grant–Lafayette Elec. Coop.,* 201 Wis.2d 416, 548 N.W.2d 829 (1996); *Kolpin v. Pioneer Power & Light Co.,* 162 Wis.2d 1, 469 N.W.2d 595 (1991); *Stunkel v. Price Elec. Coop.,* 229 Wis.2d 664, 599 N.W.2d 919 (1999). In none of these cases was there any recovery on the sole theory of nuisance.

In *Kuper,* the South Dakota Supreme Court held the trial court erred in submitting a stray voltage case to the jury on the theory of nuisance. 557 N.W.2d at 761–62.

The court relied on a South Dakota statute, which provided, "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." *Id.* at 761 (quoting SDCL 21–10–2). Rural electric cooperatives, specifically authorized by South Dakota law, are required to construct, operate, and maintain their electrical distribution systems in accordance with the provisions of the National Electric Safety Code (which has been adopted in South Dakota). *Id.* Therefore, the court concluded, the South Dakota legislature "has made it quite clear that a public utility cannot be designated a nuisance." *Id.* The court noted that "[i]n granting an exemption from nuisance actions to statutorily authorized activities, our legislature obviously adopted a public policy that private interests must endure some inconvenience for the general populace to receive the benefits of utilities." *Id.*

In *Kaech*, the plaintiff argued that the trial court erred in dismissing plaintiff's claim based on nuisance. *Kaech*, 23 P.3d at 534. The court concluded that the plaintiff's allegation that stray voltage escaped from faulty insulators and damaged his dairy herd was essentially a "negligence claim with multiple theories." *Id.* at 541. Because "a nuisance claim that is simply a restated negligence claim need not be considered separately from the negligence claim," the court held that the trial court did not err in dismissing plaintiff's nuisance claim. *Id.*

In *Jackson County Hog Producers*, the appellate court affirmed the trial court's dismissal of a nuisance claim against an electric utility for damage allegedly caused by stray voltage. 592 N.W.2d at 117. The court concluded the nuisance claim was merely a restatement of the plaintiff's negligence claim, which was properly dismissed as barred by the statute of limitations. *Id.*

The Wisconsin Supreme Court has expressly adopted the Restatement (Second) of Torts section 822 into its law of private nuisance. *CEW Mgmt. Corp. v. First Fed. Sav. & Loan Ass'n*, 88 Wis.2d 631, 277 N.W.2d 766, 767 (1979). On the issue of private nuisance, the Restatement provides:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Restatement (Second) of Torts § 822 (1979).

In *Vogel*, applying section 822 of the Restatement (Second) of Torts, the Wisconsin Supreme Court held that nuisance law is applicable to stray voltage claims "because excessive levels of stray voltage may invade a person's private use and enjoyment of land." *Vogel*, 548 N.W.2d at 834. The court also held that whether there was such an invasion was reserved for the trier of fact. *Id.* Finally, based on the record before it, the court concluded "that the trial court did not err by construing the nuisance action as an *unintentional invasion* and *otherwise actionable under negligence*, and by not submitting the question of intentional invasion to the jury." *Id.* at 837 (emphasis added). Finally, the court affirmed the trial court's judgment reducing the amount of damages for plaintiffs' contributory negligence, because "a nuisance claim based on an unintentional invasion is properly subject to

the defense of contributory negligence." *Id.*

In *Stunkel*, the Wisconsin Court of Appeals applied and elaborated upon *Vogel. Stunkel*, 599 N.W.2d at 921–23. Dairy farmers brought a claim against their electric company on negligence and nuisance theories, alleging that excessive stray voltage caused by the electric company resulted in their herd's lower milk production. *Id.* at 921. The jury concluded the electric company was not negligent in permitting stray voltage to exist on the plaintiffs' farm, but also found the electric company operated its utility in a manner that created a nuisance. *Id.* The trial court concluded that the plaintiffs were not entitled to recover damages unless the jury had answered the negligence inquiry affirmatively, and entered judgment dismissing the complaint. *Id.* The plaintiffs presented the court of appeals with one issue: whether a claim for private unintentional nuisance requires proof of actionable underlying conduct and, if so, whether such conduct was established in this case. *Id.*

Relying on Restatement (Second) of Torts section 822, the *Stunkel* court concluded that "no claim for private nuisance may be made without the underlying prerequisite conduct being proved." *Id.* at 923. Therefore, to recover for a private unintentional nuisance, the plaintiffs had to prove the underlying negligent conduct. *Id.* The court affirmed dismissal of the complaint, concluding that the record supported the jury's finding that the defendant did not engage in negligent conduct causing damage to the plaintiff. *Id.* at 924.

■ **D. The merits.** The foregoing survey of our nuisance cases makes clear that there can be a nuisance claim *without* an underlying actionable conduct, such as negligence, being proved. Additionally, such a claim can be established *without* a showing of intentional conduct. This, of course, is contrary to the position of the Restatement (Second) of Torts section 822, which this court has not adopted.

■ The key for such a stand-alone claim of nuisance is that the degree of danger likely to result in damage must be *inherent* in the thing itself. *Guzman*, 489 N.W.2d at 11. Excessive stray voltage from an electric utility resulting in damage to a dairy herd meets that test.

■ Interstate and amicus assert that permitting users of electricity to obtain large judgments against utilities without proving the utilities' negligence, fault, or wrongdoing will result in large economic and societal costs. They further assert that without assurance that a reasonable care standard will be applied when questions about the utilities' conduct arise, "public service utilities will have absolutely no guide for their conduct, and no basis for the important decisions they must make which affect the great mass of people they serve."

Interstate relies heavily on *Blackman v. Iowa Union Electric Co.*, 234 Iowa 859, 14 N.W.2d 721 (1944), to support its argument that a claim of nuisance against a utility can only be predicated upon negligence. In *Blackman*, the plaintiff sued an electric and gas company for personal injury and property damage caused by the escape of gas that flooded plaintiff's home. *Id.* at 860, 14 N.W.2d at 722. The plaintiff's petition alleged the defendant "negligently and carelessly allowed gas to escape from its mains and become a nuisance in plaintiff's property and to flood into and through plaintiff's property … occupied as his home." *Id.* The case was also tried on that theory. *Id.* at 862, 14 N.W.2d at 723. Therefore the case cannot support the proposition that a claim of nuisance against a utility can only be predicated

upon negligence. Here, the Martins dismissed their negligence count and tried the case solely on the basis of nuisance.

Finally, Interstate contends that by allowing the Martins to proceed under a nuisance claim not predicated on negligence, the district court essentially applied a strict liability standard against the utility, in conflict with our decision in *Schlader v. Interstate Power Co.*, 591 N.W.2d 10 (Iowa 1999). *In Schlader*, the plaintiffs filed a petition raising counts of negligence, strict products liability, breach of implied warranties, breach of contract, and gross negligence. *Id.* at 11. Significantly, nuisance was not pled. We affirmed the district court's summary judgment ruling against the plaintiffs on their strict liability claim that was premised on products liability under section 402A of the Restatement (Second) of Torts. *Id.* at 12–13. In doing so, we said: "It seems apparent that we would astonish the legislature if we were to adopt strict liability regarding stray voltage." *Id.* at 12. We noted the repeal of Iowa Code section 478.16 (1985), which had imposed a rebuttable presumption of negligence against a utility in case of injury to any person or property by an electricity line. *Id.* at 13. We viewed the repeal as "weigh[ing] strongly against strict liability." *Id.* We therefore refused to impose it. *Id.*

It is true that one could read *Schlader* as Interstate does, and come away with the impression that some underlying prerequisite conduct like negligence is necessary to establish liability against electric utilities in stray voltage cases. This, of course, conflicts with the present state of nuisance law in Iowa, an issue that we did not consider and address in *Schlader*. We therefore reject any impression one might draw from *Schlader* that some underlying prerequisite conduct is necessary to establish a nuisance claim against electric utilities in stray voltage cases.

Unlike South Dakota, Iowa has no statute exempting electric utilities from nuisance claims. The argument here, of course, is that we as a court should not wait for legislative action and should on our own adopt a similar stance in the name of public policy. We decline to do so. Any exception to our nuisance law with respect to electric utilities should come from the legislature and not from this court.

We conclude the district court correctly submitted the nuisance claim without an accompanying negligence claim.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except CADY, J., who dissents and TERNUS, J., who joins this dissent.

CADY, Justice (dissenting).

I respectfully dissent.

A common law claim for nuisance does not exist as a separate tort theory of recovery from negligence in every case, but only in those circumstances where there is a " 'degree of danger (likely to result in damage) inherent in the thing [responsible for the harm], beyond that arising from mere failure to exercise ordinary care in its use.' " *Guzman*, 489 N.W.2d at 11 (quoting *Hall v. Town of Keota*, 248 Iowa 131, 142, 79 N.W.2d 784, 790 (Iowa 1956)). This means that the inherent degree of danger must be something more than negligence. *Id.* If the harm is nothing more than negligence, there is no claim for nuisance. *Id.*

The majority incorrectly concludes that excessive stray voltage responsible for damage to a dairy herd meets this test of a nuisance. It does not, because the case

only satisfies part of the test. Although some stray voltage is inherent in the process of supplying electricity, the undesirable levels of stray voltage responsible for harm to cattle result because of "problems in the electrical systems." Yelkovac, 28 Val. U.L.Rev. at 1112–13. Stray voltage can be minimized or controlled by proper methods of distribution. *Id.* at 1119–20. Thus, the failure of a utility to properly minimize and contain stray voltage to an acceptable inherent level would be no more than negligence. The majority has created a case for nuisance that is not supported by law, facts, or science.

The effect of the majority decision is to impose a form of strict liability on a utility in a stray voltage case. Nearly sixty years ago, we expressly said that a utility "can only be held liable for its own negligence." *Blackman,* 234 Iowa at 862, 14 N.W.2d at 723. Moreover, this concept was recently reaffirmed in *Schlader v. Interstate Power Co.,* where we refused to allow the concept of strict liability to creep into a stray voltage case brought against the utility. *Schlader,* 591 N.W.2d at 12. Furthermore, we indicated our legislature has expressed its intent not to impose strict liability regarding stray voltage. *Id.* at 13.

The majority side-steps *Blackman* by pointing out that it involved mixed claims of negligence and nuisance, unlike this case. Yet, this is a distinction without a difference. The plaintiff in *Blackman* asserted claims for nuisance and negligence, but the court made it clear that the utility could not be subject to liability for nuisance, only negligence. *Blackman,* 234 Iowa at 862, 14 N.W.2d at 723. The court specifically held that because "proof of

negligence was essential in this case, it cannot be said to be a nuisance action." *Id.* The court further concluded "a gas company is not liable as an insurer for injuries sustained as a result of the escape of gas." *Id.* Proof of negligence was essential because the harm inherent in transporting gas by pipes into homes is not so great that reasonable care on the part of the utility could not make it safe. This law applies with equal force to this case.

The majority also limits the impact of *Schlader* by claiming that its application to this case conflicts with the existing law of nuisance. The conflict, however, is only on the surface, not in principle. Under our law of nuisance, there can be no claim for nuisance if the thing responsible for the harm involves only a breach of care. *Guzman,* 489 N.W.2d at 11. Under our long line of authority, supplying electricity is not so inherently harmful that reasonable care cannot make it safe. Consequently, the law of nuisance does not provide a remedy.

The decision of the majority is not only contrary to our prior cases and the intent of our legislature, it is against the great weight of authority from other jurisdictions. I would reverse the district court. Negligence was the only theory of recovery available to the plaintiffs in this case.

TERNUS, J., joins this dissent.