# IN THE SUPREME COURT OF IOWA

No. 23–0537

Submitted January 23, 2024—Filed June 21, 2024

**MARK VAGTS, JOAN VAGTS, ANDREW VAGTS,** and **VAGTS DAIRY, LLC.,**

Appellees,

vs.

**NORTHERN NATURAL GAS COMPANY,**

Appellant.

---

Appeal from the Iowa District Court for Fayette County, David Nelmark, Judge.

Defendant natural gas pipeline operator appeals from judgment entered on nuisance claim. **AFFIRMED.**

McDonald, J., delivered the opinion of the court, in which Oxley, McDermott, and May, JJ., joined, and in which Christensen, C.J., and Waterman and Mansfield, JJ., joined as to part III. Mansfield, J., filed a special concurrence, in which Christensen, C.J., and Waterman, J., joined.

Brant M. Leonard (argued), Bret A. Dublinske, and Sarah A. Arbaje of Fredrikson and Byron, P.A., Des Moines, for appellant.

Scott Lawrence (argued) of Lawrence Law Office, S.C., Chilton, Wisconsin, and Andrew F. Van Der Maaten of Anderson, Wilmarth, Van Der Maaten, Belay, Fretheim, Gipp, Evelsizer Olson, Noble, Lynch & Zahasky, Decorah, for appellees.

**McDonald, Justice.**

The Vagts family owns and operates a dairy farm in West Union, Iowa. Northern Natural Gas Company (NNG) operates a natural gas pipe

line that runs under the Vagts' property. NNG uses a cathodic protection system, which runs an electrical current through the pipeline to prevent the corrosion of the pipeline. The Vagts alleged that stray voltage from the cathodic protection system distressed their dairy herd and caused them damages. They filed this nuisance suit against NNG. The jury returned a verdict awarding the Vagts a total of $4.75 million in damages. NNG timely filed this appeal. NNG raises two issues in this appeal. First, whether the district court erred in instructing the jury on nuisance without including negligence as an element of the claim. Second, whether the district court erred in denying NNG's motion for remittitur.

I.

In 1957, Lawrence Vagts and his brother Ewald Vagts purchased a small twenty- to thirty-cow stanchion barn in West Union to start a dairy. The Vagts family has continuously operated the dairy since its founding in 1957. Today, Vagts Dairy, LLC. is managed by Lawrence's grandson, Mark Vagts, and Mark's son, Andrew Vagts. Mark and his wife, Joan, live on a heifer farm about one mile north of the dairy. Andrew, his wife, Stephanie, and their four daughters live at the homestead on the dairy.

NNG is an interstate natural gas pipeline company that provides natural gas transmission services to utilities and other end-use customers. NNG's pipeline stretches across eleven states from Texas to Michigan and includes approximately 14,000 miles of pipeline. NNG operates its pipeline pursuant to a Federal Energy Regulatory Commission certificate of public convenience and necessity. The Federal Petroleum and Hazardous Materials Safety

Administration requires pipeline companies such as NNG to use a cathodic protection system. *See* 49 C.F.R. § 192.455(a)(2) (2019) (providing that "each buried or submerged pipeline . . . must have a cathodic protection system"). A cathodic protection system runs a low-level electrical current through the pipeline to mitigate corrosion. The system receives electrical current through a rectifier that converts alternating current (AC) to direct current (DC). The rectifier connects the pipeline and an anode bed, which consists of a series of anodes buried in the ground. Electrical current runs through the ground between the anode bed and the rectifier to complete a circuit.

The relationship between the parties began in 1960 when the Vagts granted NNG an easement to lay its pipeline through the Vagts' property. The following year, the Vagts granted NNG a second easement to install a cathodic protection system on the Vagts' property. In 1964, NNG installed both its pipeline and an anode bed on the Vagts' property. In 2013, NNG replaced the existing, depleted anode bed with new anodes. The anode bed remained in the same location. In 2017, the Vagts substantially increased the size of their dairy operation. They increased the size of their free stall barn, extending it westward closer to NNG's pipeline and cathodic protection system, and they increased the size of their herd to approximately 500 cows.

After 2013, the Vagts began to experience difficulty with their dairy operation. The cows began to display "bizarre, abnormal behavior." They kicked off milking units, got into the manure, stood in the waterers, and drank abnormally. The cows became increasingly sick. The somatic cell count in the herd increased. Milk production declined. Milk quality declined. The cows died at an abnormally high rate. In a typical year, approximately 5% of a dairy herd might die. In the year 2022, more than 17% of the Vagts' dairy herd died. All of

this resulted in excess costs, decreased revenue, and lost profits for the dairy as well as great stress and anxiety for the Vagts.

The Vagts engaged a number of people to diagnose and remedy the situation. They consulted with farm operators, nutritionists, veterinarians, and equipment manufacturers. None could explain the bizarre behaviors, sickness, and death. After exhausting other possibilities, the Vagts decided to test their farm for stray voltage, which can be "catastrophic to a dairy farm." *Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 12 (Iowa 1999) (quoting *Larson v. Williams Elec. Co-op., Inc.*, 534 N.W.2d 1, 1 n.1 (N.D. 1995)). The Vagts hired Lawrence Neubauer to test for stray voltage on their farm. Neubauer detected electrical currents in the ground, primarily DC current.

The Vagts subsequently contacted the Allamakee–Clayton Electric Cooperative, Inc. (ACEC) regarding the stray voltage. ACEC tested the site and reported stray electrical current. ACEC subsequently contacted NNG. Representatives of NNG visited Vagts Dairy and detected stray voltage. NNG believed that the detected voltage fell below the level of concern established in the "Redbook" and the Iowa Stray Voltage Guide. The Redbook is published by the United States Department of Agriculture and is cited by the Iowa Stray Voltage Guide. Nonetheless, in late October 2020, NNG shut down the rectifier nearest to the Vagts' free-stall barn. However, NNG added anode beds to the cathodic protection system and increased the electrical energy applied to each of the anode beds.

In March 2021, the Vagts filed this suit against NNG and ACEC. Counts 1 and 2 asserted claims of nuisance and negligence, respectively, against NNG. Count 3 asserted a claim of negligence against ACEC. Count 4 asserted a claim of abatement against NNG and ACEC. In October 2022, the Vagts dismissed their

negligence action against NNG. Soon after, in November 2022, the Vagts dismissed with prejudice their negligence action against ACEC.

The matter came on for trial in January 2023. The Vagts submitted proposed jury instructions to the district court. The Vagts proposed marshaling instruction for its nuisance claim provided that:

> Plaintiffs, Mark Vagts, Joan Vagts, Andrew Vagts and Vagts Dairy, LLC, claim the Defendant, [NNG], created a nuisance by stray voltage introduced on their farm.
>
> Nuisance is explained to you in another instruction.
>
> The Vagts must prove all of the following propositions:
>
> 1. [NNG] created a nuisance on [the] Vagts' farm.
>
> 2. The nuisance was a proximate cause of damages to [the] Vagts.
>
> 3. The invasion was unreasonable.
>
> 4. The degree of harm was significant.
>
> 5. The amount of damage.

In a written statement regarding the plaintiffs' proposed jury instructions, NNG stated that it "agree[d] to the Proposed Jury Instructions" with two exceptions. First, NNG objected to an instruction regarding permanent nuisance damages. The Vagts' claim for permanent nuisance was ultimately settled during trial, and NNG's objection on this point is immaterial to the resolution of this appeal. Second, NNG objected to the marshaling instruction. It argued the "Plaintiffs should be required to prove negligence in order to recover under a nuisance theory." In NNG's view, negligence is an element of nuisance, and "comparative fault principles therefore apply." NNG proposed the following instruction:

> Required Elements of Nuisance. To sustain a claim of nuisance in this case, plaintiffs must prove all of the following:

1. A private nuisance existed. . . .

2. The invasion or interference resulted in significant harm. . . .

3. Defendant was negligent. A person is negligent when it fails to exercise ordinary care. Ordinary care is the care that a reasonable person would use in similar circumstances. A person is not using ordinary care and is negligent, if the person, without intending to do harm, does something or fails to do something that a reasonable person would recognize as creating an unreasonable risk of invading or interfering with another's use or enjoyment of property.

4. Defendant's negligence caused the private nuisance. This does not mean that defendant's negligence was "the cause" but rather "a cause" because a private nuisance may have more than one cause. Someone's negligence caused the private nuisance if it was a substantial factor in producing the nuisance. . . .

5. The nature and extent of plaintiffs' damage.

If Plaintiffs have failed to prove these propositions, Plaintiffs are not entitled to recover damages on the theory of nuisance. If Plaintiffs have proven both of these propositions, Plaintiff[s] [are] entitled to damages in some amount from Defendant.

The district court held that negligence was not an element of the nuisance claim. The district court instructed the jury in accord with the Vagts' proposed jury instructions and disallowed evidence relating to a comparative fault defense. The district court submitted the following instruction defining nuisance.

A "nuisance" is whatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property, so as to unreasonably interfere with the comfortable enjoyment of life or property. It is a non-trespassory invasion of another's interest in the private use and enjoyment of land. A private use is a use of land that a person is privileged to make as an owner. The existence of a nuisance does not depend on the intention of the party creating it. A condition resulting from lawfully conducted business may constitute a nuisance.

. . . .

One creating a nuisance is subject to liability if: (1) the nuisance is a proximate cause of damages to another whose interest in the private use and enjoyment of land is invaded, (2) the invasion

is unreasonable and (3) the degree of harm is significant under the circumstances.

. . . .

In determining whether an invasion is "unreasonable" you shall consider:

(a) the extent of the harm involved;

(b) the character of the harm involved;

(c) the type of use or enjoyment invaded;

(d) the suitability of the particular use or enjoyment invaded to the character of the locality;

(e) the burden on the person harmed of avoiding the harm;

(f) the historic use of the land and whether the use precedes the nuisance;

(g) the suitability of the invading conduct to the character of the locality; and,

(h) the reasonableness of conducting the defendant's business in the manner, at the place and under the circumstances in question.

The degree of harm is "significant" if normal persons in the community would regard the invasion as definitely offensive, seriously annoying or intolerable. If normal persons in the community would not regard the invasion as such, the invasion is not a significant one, even though the idiosyncrasies of the Vagts may make it unendurable to them.

NNG did not object to this instruction. And it had no reason to do so; the instruction was a correct statement of the law regarding what constitutes a nuisance. *See Weinhold v. Wolff*, 555 N.W.2d 454, 459 (Iowa 1996) (en banc) ("The standard for the determination of significant character is the standard of normal persons or property in the particular locality. If normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable, then the invasion is significant." (quoting 4

Restatement (Second) of Torts § 821F cmt. *d*, at 105–06 (Am. L. Inst. 1979) [hereinafter Restatement (Second) of Torts])).

Based on this instruction, the jury found that normal persons in the community would regard the stray voltage from the cathodic protection system as definitely offensive, seriously annoying, or intolerable, that the stray voltage was an unreasonable interference with the Vagts' comfortable enjoyment of their life and property, and that the stray voltage was a nuisance.[1] The jury awarded the Vagts $3 million in economic damages, $1.25 million for personal inconvenience, annoyance, and discomfort, and $500,000 for the loss of use and enjoyment of land.

NNG filed a posttrial motion. NNG did not challenge the district court's instruction defining nuisance or the sufficiency of the evidence supporting the jury's finding of nuisance. Instead, as relevant here, NNG claimed the district court erred in submitting the nuisance claim to the jury without including negligence as an element of the claim as set forth in its proposed instruction. The district court denied the motion, concluding that "[i]t is clear that no breach of a standard of care is required to prove a common law nuisance claim." NNG also moved for a new trial or, in the alternative, remittitur regarding noneconomic damages. In NNG's view, the noneconomic damages were not supported by the evidence and allowed for a double recovery. The district court

---

[1]The special concurrence seems to contend, or at least suggest, that stray voltage cannot, as a matter of law, constitute a nuisance. The special concurrence contends that a stray voltage case is different from a traditional nuisance case because stray voltage causes harm only to animals and because use of agricultural land to operate a dairy farm is a "specialized" or "idiosyncratic" use of property. This Fayette County jury—possessing knowledge of local conditions—obviously disagreed. *See Hartzler v. Town of Kalona*, 218 N.W.2d 608, 610 (Iowa 1974) (stating whether something constitutes a nuisance is a question of fact for the jury). Regardless, the issue is not before us as NNG has not raised this issue on appeal. "This court is not a roving commission that offers instinctual legal reactions to interesting issues that have not been raised or briefed by the parties . . . ." *City of Davenport v. Seymour*, 755 N.W.2d 533, 545 (Iowa 2008).

denied that motion. Upon the stipulation of the parties, the district court provided NNG with a credit against the judgment in the amount of $500,000 for the settlement the Vagts reached with ACEC.

## II.

We first address NNG's contention that the district court erred in instructing the jury that the Vagts could establish their nuisance claim without proof of negligence and that the district court erred in denying its motion for judgment notwithstanding the verdict and motion for new trial. Our review is for the correction of errors at law. *See State v. Ruesga*, 619 N.W.2d 377, 380 (Iowa 2000) (en banc).

## A.

Iowa law distinguishes between negligence and nuisance. "Negligence is a type of liability-forming conduct, for example, a failure to act reasonably to prevent harm. In contrast, nuisance is a liability-producing condition." *Kellogg v. City of Albia*, 908 N.W.2d 822, 828 (Iowa 2018) (quoting *Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 315 (Iowa 1998) (en banc)). While negligence may accompany a nuisance, it "is not an essential element of nuisance." *Id.* (quoting *Bormann*, 584 N.W.2d at 315). "If the condition constituting the nuisance exists, the person responsible for it is liable for resulting damages to others even though the person acted reasonably to prevent or minimize the deleterious effect of the nuisance." *Id.* (quoting *Bormann*, 584 N.W.2d at 315).

The distinction between nuisance and negligence is long-standing. "Early cases of 'private nuisance' seem to have assumed that the defendant was strictly liable, and to have made no inquiry as to the nature of his conduct." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 87, at 624 (5th ed. 1984). According to Blackstone, nuisance was "any thing done to the hurt or annoyance of the lands, tenements, and hereditaments of another." 3 William Blackstone,

*Commentaries* *216. The essence of nuisance is "*sic utere tuo, ut alienum non laedas*," *id.* at *217, or to use one's property in such a way as to not injure another's. At common law, nuisance did not depend upon the fault of the defendant. "[A]n actionable nuisance" existed when a neighbor engaged in an offensive trade, "though [such trades] are *lawful* and necessary." *Id.* (emphasis added).

The general assembly codified the common law understanding of nuisance in Iowa's earliest statutes. The Iowa Code of 1851 defined nuisance as "[w]hatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property." Iowa Code § 2131 (1851). The general assembly's codification of nuisance as a liability-producing condition without regard to negligence has endured with minimal revision since 1851. The Code currently provides that:

> [w]hatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere unreasonably with the comfortable enjoyment of life or property, is a nuisance, and a civil action by ordinary proceedings may be brought to enjoin and abate the nuisance and to recover damages sustained on account of the nuisance.

Iowa Code § 657.1(1) (2021).

In addition to the general definition of nuisance set forth in section 657.1, the Code also enumerates particular nuisances:

> 1. The erecting, continuing, or using any building or other place for the exercise of any trade, employment, or manufacture, which, by occasioning noxious exhalations, unreasonably offensive smells, or other annoyances, becomes injurious and dangerous to the health, comfort, or property of individuals or the public.

> 2. The causing or suffering any offal, filth, or noisome substance to be collected or to remain in any place to the prejudice of others.

3. The obstructing or impeding without legal authority the passage of any navigable river, harbor, or collection of water.

4. The corrupting or rendering unwholesome or impure the water of any river, stream, or pond, or unlawfully diverting the same from its natural course or state, to the injury or prejudice of others.

5. The obstructing or encumbering by fences, buildings, or otherwise the public roads, private ways, streets, alleys, commons, landing places, or burying grounds.

6. Houses of ill fame, kept for the purpose of prostitution and lewdness, gambling houses, places resorted to by persons participating in criminal gang activity prohibited by chapter 723A, or places resorted to by persons using controlled substances, as defined in section 124.101, subsection 5, in violation of law, or houses where drunkenness, quarreling, fighting, or breaches of the peace are carried on or permitted to the disturbance of others.

7. Billboards, signboards, and advertising signs, whether erected and constructed on public or private property, which so obstruct and impair the view of any portion or part of a public street, avenue, highway, boulevard, or alley or of a railroad or street railway track as to render dangerous the use thereof.

8. Any object or structure hereafter erected within one thousand feet of the limits of any municipal or regularly established airport or landing place, which may endanger or obstruct aerial navigation, including take-off and landing, unless such object or structure constitutes a proper use or enjoyment of the land on which the same is located.

9. The depositing or storing of flammable junk, such as old rags, rope, cordage, rubber, bones, and paper, by dealers in such articles within the fire limits of a city, unless in a building of fireproof construction, is a public nuisance.

10. The emission of dense smoke, noxious fumes, or fly ash in cities is a nuisance and cities may provide the necessary rules for inspection, regulation and control.

11. Dense growth of all weeds, vines, brush, or other vegetation in any city so as to constitute a health, safety, or fire hazard is a public nuisance.

12. Trees infected with Dutch elm disease in cities.

*Id.* § 657.2. "These statutory enumerations do not modify the common law rule applicable to nuisances. The term private nuisance refers to an actionable

interference with a person's interest in the private use and enjoyment of his land." *Kellerhals v. Kallenberger*, 103 N.W.2d 691, 694 (Iowa 1960)

When we "read [the] statutes as a whole," *State v. Boone*, 989 N.W.2d 645, 649 (Iowa 2023), it is clear that an action for nuisance does not require proof of negligence. Neither section 657.1 nor section 657.2 requires proof of negligence to establish a nuisance. Instead, nuisance is "a condition, and not an act or failure to act on part of the person responsible for the condition." *Bowman v. Humphrey*, 109 N.W. 714, 715 (Iowa 1906); *see also* Dan. B. Dobbs, *The Law of Torts* § 464, at 1324 (2000) ("[A] finding of nuisance is based upon the plaintiff's harm and not necessarily upon the defendant's conduct."). Under the Code, "[i]f the wrongful condition exists, and the person charged therewith is responsible for its existence, he is liable for the resulting damages to others, though he may have used the highest possible degree of care to prevent or minimize the deleterious effects." *Bowman*, 109 N.W. at 715.

Since the time of Iowa's founding, this court's precedents are in accord with the common law and statute. Our cases hold that negligence is not an element of a nuisance claim, even when the defendant is acting lawfully and even when the defendant's activities are not inherently dangerous. *Steamboat "Globe" v. Kurtz* involved a case where the operation of a ferry on the Des Moines River created an alleged nuisance. 4 Greene 433, 434, 436 (Iowa 1854). We explained, " 'The term *nuisance* signifies anything that causes *loss, inconvenience, annoyance, or damage.*' 3 Petersdorf's Com. Law, 550. If the thing complained of causes neither of these, it is no nuisance. But if it causes either in the *least degree*, the person complained of must be held answerable, no matter how small the damage may be." *Id.* at 436. We rejected the defendant's contention that legislative authorization to operate the ferry "authorize[d] a *nuisance* in our navigable rivers. No such authority is granted." *Id.*

The case of *Bushnell v. Robeson* involved a nuisance action against a slaughterhouse. 17 N.W. 888, 889 (Iowa 1883). After reviewing an extensive factual record, we concluded "there emanate[d] odors and smells which [were] injurious to health and the comfortable enjoyment of property." *Id.* Although we were "not prepared to say the premises [were] not kept as clean as the business carried on will permit; nevertheless, we [thought] such business, while necessary and essential, when carried on at the place it [was,] must [have been] regarded as a nuisance." *Id.*

In *Churchill v. Burlington Water Co.*, the plaintiff filed suit "for a nuisance caused by the defendant in the operation of its works, whereby large quantities of smoke and soot were emitted from the smokestack of its works." 62 N.W. 646, 646 (Iowa 1895). The smoke and soot "carried upon plaintiff's premises and into his dwelling house; rendering the air impure and unwholesome, and interfering with plaintiff's comfortable enjoyment of life and of his property." *Id.* The defendant defended itself on the ground that its works were constructed "under legislative authority." *Id.* Specifically, a city ordinance authorized the defendant to build and operate its works. *Id.* We rejected this defense and affirmed the damages award against the defendant, although it operated pursuant to legislative authority. *Id.* at 648. "An act done under such circumstances, and within the proper limits of the power given, would not constitute a public nuisance for which one might be indicted, but might be a private nuisance; and damages resulting therefrom, as a private nuisance, might be recovered, and in such a case the legislative grant would be no protection." *Id.* at 647.

*Rhoades v. Cook* concerned a meat market and butcher shop operating within city limits. 98 N.W. 122, 122–23 (Iowa 1904). The defendant "occasionally slaughtered young animals in the rear rooms of his building" and "at least twice a week render[ed] lard and tallow in this room." *Id.* at 122. The business

produced "noxious and offensive smells." *Id.* at 123. The defendant contended that he had exercised ordinary care in the operation of his business, and the district court dismissed the petition. *Id.* This court reversed the trial court's dismissal of the petition. *Id.* We explained that "[i]t may be that defendant has generally exercised ordinary care in the conduct of this business, but, notwithstanding such care it was productive of odors which were offensive to those within their range, and necessarily produced physical discomfort." *Id.* "Under our statutes, . . . [i]t is sufficient if [the odors] offend the senses in such a manner as to produce actual discomfort." *Id.*

Similarly, *Bowman v. Humphrey* concerned a lawful creamery whose refuse poured onto and damaged a neighboring property. 109 N.W. at 714. This court rejected the contentions that nuisance required proof of negligence and that compliance with the law was a defense:

> Nuisance is a condition, and not an act or failure to act on part of the person responsible for the condition. If the wrongful condition exists, and the person charged therewith is responsible for its existence, he is liable for the resulting damages to others, though he may have used the highest possible degree of care to prevent or minimize the deleterious effects. Nor is it any answer to say that a creamery, or tannery, or industrial plant of any kind is a perfectly legitimate enterprise, or one of great and general convenience and benefit . . . .

*Id.* at 715. "Even where negligence is alleged in an action for damages on account of nuisance, it is not necessary to prove it." *Id.* at 716. "The negligence, if any, may usually be proved, not as being itself essential to the right of recovery, but for the purpose of fixing the responsibility for the existence of the condition which constitutes the cause of complaint." *Id.* at 715.

The case of *Ryan v. City of Emmetsburg* concerned a municipal sewage plant constructed near the plaintiff's home. 4 N.W.2d 435, 437 (Iowa 1942). The city received approval for the construction of the plant from the department of

health, hired a "competent sanitary engineer," and chose a "modern" type of plant used throughout the nation. *Id.* at 437–38. Nonetheless, the plant produced noxious odors that caused "substantial discomfort to plaintiff and members of his family." *Id.* at 438. As in this case, the defendant challenged the jury instruction that it could be held liable for creating a nuisance even though the defendant "exercised due care and caution to prevent damage to others." *Id.* at 439. We concluded the instruction was not erroneous because "[n]egligence was not essential to appellant's liability in this case." *Id.* at 440. We further explained that the city could not "absolve itself from liability for damage caused by a private nuisance of this character by proof that the plant was constructed under general legislative authority and in accordance with an approved plan prepared by competent engineers and duly adopted." *Id.*

In *Iverson v. Vint*, the defendant dumped about 2,000 gallons of molasses that went unused in the operation of his feed mill, and the molasses polluted the plaintiff's well water. 54 N.W.2d 494, 494–95 (Iowa 1952). The defendant claimed that his dumping of molasses was proper in that it conformed to the custom and common practice of feed manufacturers. *Id.* at 495. This court rejected the defendant's contention. *Id.* at 495–96. Citing *Bowman*, we explained that, as this was an action predicated on nuisance, negligence was not essential to the right of recovery. *Id.* at 496. "Nor is the existence of a nuisance affected by the intention of its creator not to injure anyone." *Id.* In sum, "[t]he asserted custom of his business and [the defendant's] intention to injure no one would not insulate [the defendant] from liability for the resulting damage." *Id.*

In *Martins v. Interstate Power Co.*, the plaintiff dairy farmers asserted a nuisance claim "without an accompanying negligence claim in a stray voltage case against an electric utility." 652 N.W.2d 657, 658 (Iowa 2002). The district court permitted the plaintiffs to proceed upon a nuisance theory without proof

of negligence. *Id.* at 659. The jury returned a verdict for $700,000 in favor of the plaintiffs. *Id.* The utility appealed and argued that proof of negligence was an element of the nuisance claim. *Id.* at 659–60. *Martins* rejected the utility's argument "that some underlying prerequisite conduct like negligence is necessary to establish liability against electric utilities in stray voltage cases." *Id.* at 665. The *Martins* court explained the utility's contention "conflict[ed] with . . . nuisance law in Iowa." *Id.* "Iowa has no statute exempting electric utilities from nuisance claims." *Id.* The court explained that "[t]he argument here, of course, is that we as a court should not wait for legislative action and should on our own adopt a similar stance in the name of public policy." *Id.* The court "decline[d] to do so. Any exception to our nuisance law with respect to electric utilities should come from the legislature and not from this court." *Id.* The court held that "the district court correctly submitted the nuisance claim without an accompanying negligence claim." *Id.*

In *Simpson v. Kollasch,* "[n]eighbors of two proposed hog confinement facilities filed an anticipatory nuisance claim against the developers of the confinement facilities and the owners of the land where manure from the operations was to be spread." 749 N.W.2d 671, 672 (Iowa 2008). The district court permitted the defendants to introduce evidence of the standards and regulations issued by the Iowa Department of Natural Resources. *Id.* at 672–73. While we found that the district court did not err in finding the evidence was relevant, we also held that "compliance with regulations is not a defense to a nuisance claim." *Id.* at 674.

These authorities make clear that negligence is not an element of nuisance under long-established Iowa law. In support of its argument to the contrary, NNG relies on an inapposite line of cases regarding nuisance-by-negligence claims. *See, e.g., Guzman v. Des Moines Hotel Partners, Ltd. P'ship.,* 489 N.W.2d 7

(Iowa 1992); *Hall v. Town of Keota*, 79 N.W.2d 784 (Iowa 1956); *Blackman v. Iowa Union Elec. Co.*, 14 N.W.2d 721 (Iowa 1944). For example, in *Blackman v. Iowa Union Electric Co.*, the plaintiffs brought a nuisance claim against a pipeline company related to the release of gas from the pipeline. 14 N.W.2d at 722–23. The *Blackman* court reiterated the general rule that negligence is not an element of a nuisance claim:

> [A] person who creates or maintains a nuisance is liable for the resulting injury to others without regard to the degree of care or skill exercised by him to avoid such injury, and notwithstanding he exercised reasonable or ordinary care and skill, or even the highest possible degree of care, or employed the most approved methods and appliances in the performance of the acts complained of.

*Id.* at 723 (quoting 39 Am. Jur. 305–06). However, the escape of gas in that case was not a normal part of the defendant's business operation but was due to an act of alleged negligence. *See id.* We explained that although the case was styled as a nuisance action, "it cannot be said to be a nuisance action." *Id.* Because the case was actually a nuisance-by-negligence action, a negligence instruction and contributory negligence instruction were required. *Id.*; *see also* 58 Am. Jur. 2d *Nuisances* § 63, at 630 (2023) ("Although negligence can be the cause, or a constituent or a factor of nuisance, negligence is merely one type of conduct that may give rise to a nuisance. Thus, negligence is not a necessary ingredient of a nuisance except where such nuisance is one based upon negligence." (footnotes omitted)). In nuisance-by-negligence actions such as *Blackman, Hall v. Town of Keota*, and *Guzman v. Des Moines Hotel Partners, Ltd. Partnership*, negligence must be proved "not as being itself essential to the right of recovery, but for the purpose of fixing the responsibility for the existence of the condition which constitutes the cause of complaint." *Bowman*, 109 N.W. at 715.

This case is not a nuisance-by-negligence action. It is a nuisance claim in which the plaintiffs contend that even though NNG exercised the highest possible

degree of care it nonetheless created a nuisance. *See* 58 Am. Jur. 2d *Nuisances* § 6, at 587 ("[A] defendant's failure to act reasonably, which is an essential element of negligence, is not relevant to a determination of nuisance. Liability for nuisance, unlike liability for negligence, exists regardless of the degree of care exercised to avoid injury." (footnote omitted)); *id.* § 63, at 630 ("Thus, except where the nuisance is based on negligence, negligence is not an essential or material element of a cause of action for nuisance and need not be pleaded or proven." (footnotes omitted)).

Based on the foregoing, we agree with the district court that proof of negligence is not an element in a nuisance claim, and we conclude the district court did not err in instructing the jury and in denying NNG's motion for judgment notwithstanding the verdict and motion for new trial. The common law, the controlling statute, and 170 years of precedents establish that "[i]f the condition constituting the nuisance exists, the person responsible for it is liable for resulting damages to others even though the person acted reasonably to prevent or minimize the deleterious effect of the nuisance." *Freeman v. Grain Processing Corp.*, 895 N.W.2d 105, 122 (Iowa 2017) (quoting *Bormann*, 584 N.W.2d at 315); *see also Bormann*, 584 N.W.2d at 315 ("Negligence may or may not accompany a nuisance; negligence, however, is not an essential element of nuisance."); *Valasek v. Baer*, 401 N.W.2d 33, 35 (Iowa 1987) ("The fact that defendant's hog operation was a lawful business and was being carried on in accordance with accepted standards does not impact on the finding of a nuisance. A lawful business, properly conducted, may still constitute a nuisance if it interferes with another's use of his own property."); *Page Cnty. Appliance Ctr., Inc. v. Honeywell, Inc.*, 347 N.W.2d 171, 176 (Iowa 1984) ("An action for damages for nuisance need not be predicated on negligence. Nuisance ordinarily is considered as a condition, and not as an act or failure to act on the part of the

responsible party. A person responsible for a harmful condition found to be a nuisance may be liable even though that person has used the highest possible degree of care to prevent or minimize the effect." (citations omitted)); *Claude v. Weaver Constr. Co.,* 158 N.W.2d 139, 143 (Iowa 1968) ("[A]n action for damages from nuisance is not predicated on negligence. It is a condition, not an act or failure to act. If the wrongful condition exists, the person responsible for its existence is liable for resulting damage to others.").

B.

Despite the common law, the controlling statute, and our long-standing precedents, NNG nonetheless contends the district court erred in failing to instruct the jury on negligence. In support of its argument, NNG primarily relies on *Martins.* NNG makes two somewhat contradictory arguments regarding *Martins.* First, NNG argues that *Martins* was rightly decided, that *Martins* held that nuisance requires proof of negligence unless danger is inherent in the activity producing the nuisance, that use of the cathodic protection system is not inherently dangerous, and that proof of negligence was thus required in this case. Second, NNG argues that *Martins* was wrongly decided, that *Martins* should be overruled, that this court should adopt the dissenting position in *Martins* and the Restatement (Second) of Torts section 822 (regarding nuisances), and that this court should hold that nuisance claims always require proof of negligence. We address each argument in turn.

NNG first argues that *Martins* stands for the proposition that nuisance claims cannot proceed without proof of negligence unless the conduct involves inherently dangerous activity. *Martins* was a stray voltage case against an electric utility. 652 N.W.2d at 658–59. The *Martins* court stated that "[t]he true distinction between negligence and nuisance is that 'to constitute a nuisance "there must be a degree of danger (likely to result in damage) *inherent* in the

thing itself, beyond that arising from mere failure to exercise ordinary care in its use." ' " *Id.* at 661 (quoting *Guzman*, 489 N.W.2d at 11). NNG primarily relies on this single sentence in *Martins* to argue that a nuisance claim requires proof of negligence where the conduct is not inherently dangerous.

We do not think this single sentence in *Martins* supports NNG's contention that negligence is always an element of nuisance where the activity is not inherently dangerous. The sentence in *Martins* on which NNG relies was an incorrect statement of the law. The Code provides that a nuisance is "[*w*]*hatever* is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere unreasonably with the comfortable enjoyment of life or property." Iowa Code § 657.1(1) (emphasis added). The Code does not require proof of negligence to establish a nuisance. Nor does the Code provide for nuisance liability only where there is inherent danger in the thing itself. Instead, the Code defines a nuisance as "[w]hatever" conduct that "interfere[s] unreasonably with the comfortable enjoyment of life or property" without regard to the defendant's negligence or the dangerousness of the activity. *Id.* "Whatever" is "used to emphasize a lack of restriction in referring to any thing or amount, no matter what." *Whatever, New Oxford American Dictionary* 1965 (3d ed. 2010).

The statement in *Martins* also conflicts with 170 years of precedents. As discussed above, it is black letter law in this state that negligence is neither necessary nor sufficient to establish a nuisance. A nuisance is an unreasonable interference with an ordinary use of property without regard to negligence and without regard to whether the nuisance-producing conduct was inherently dangerous. *Steamboat "Globe"* involved a lawfully operated ferry. 4 Greene at 433–34. *Bushnell* involved a slaughterhouse. 17 N.W. at 889. *Rhoades* involved a nuisance claim against a meat market and butcher shop. 98 N.W. at 122.

*Bowman* involved a lawfully operated creamery. 109 N.W. at 714. *Gates v. City of Bloomfield* involved a nuisance claim against a municipal bus depot. 53 N.W.2d 279, 279–80 (Iowa 1952). *Ryan* involved a lawfully operated sewage plant. 4 N.W.2d at 437. *Iverson* was a nuisance claim regarding the operation of a feed mill. 54 N.W.2d at 494–95. *Simpson* involved a hog confinement facility. 749 N.W.2d at 672. None of these cases required proof of negligence. And none of these cases involved conduct that was inherently dangerous.

In the end, *Martins* does not support NNG's argument. The statement in *Martins* on which NNG relies was an incorrect statement of law. *Martins* blended and confused the law of negligence, the law of nuisance, and the law of strict liability for ultrahazardous or abnormally dangerous activity. Specifically, the *Martins* court confused whether something is an "inherent danger" with "ultrahazardous activity." *Cf. Fletcher v. Conoco Pipe Line Co.*, 129 F. Supp. 2d 1255, 1261 (W.D. Mo. 2001) ("[T]he Court finds that, as a matter of law, the operation of a cathodically-protected petroleum pipeline is not an abnormally dangerous activity."). In addition, despite that stray sentence, the holding in *Martins* was correct and consistent with the common law, the controlling statute, and our precedents. The *Martins* court held "the district court correctly submitted the nuisance claim without an accompanying negligence claim." 652 N.W.2d at 665. The court explained that "our nuisance cases make[] clear that there can be a nuisance claim without an underlying actionable conduct, such as negligence, being proved. Additionally, such a claim can be established without a showing of intentional conduct." *Id.* at 664. Given the holding in *Martins*, the single sentence on which NNG relies cannot be interpreted to deviate from the statutory text and overrule *sub silentio* more than a century's worth of

precedents.[2] *See Arispe Mercantile Co. v. Cap. Ins.*, 110 N.W. 593, 594 (Iowa 1907) ("[I]f this precedent is to be construed as upholding the principle in support of which it is invoked, we do not feel free to follow it in disregard of the greatly preponderzing authority."); Bryan A. Garner et al., *The Law of Judicial Precedent* § 26, at 300 (2016) ("A court considering discordant decisions must first determine whether the perceived conflict between them is real. If at all possible, the opinions should be harmonized.").

NNG appears to realize that *Martins* does not adequately support its contention that negligence is an element of nuisance in the absence of inherently dangerous activity because NNG also argues that this court should overrule *Martins* and adopt the dissenting position in that case and section 822 of the Restatement (Second) of Torts. The dissenting justices in *Martins* took the position that "[a] common law claim for nuisance does not exist as a separate tort theory of recovery from negligence in every case, but only in those circumstances where there is a 'degree of danger (likely to result in damage) inherent in the thing [responsible for the harm], beyond that arising from mere failure to exercise ordinary care in its use.' " 652 N.W.2d at 665 (Cady, J., dissenting) (second alteration in original) (quoting *Guzman,* 489 N.W.2d at 11). Restatement (Second) of Torts section 822 provides that:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or

---

[2]Furthermore, NNG's reading of *Martins* is inconsistent with the fact that *Martins* affirmed the court of appeals decision that artfully reconciled the relevant precedents and demonstrated that nuisance does not require proof of negligence. *See Martins v. Interstate Power Co.*, No. 00–0791, 2002 WL 534890, at *2 (Iowa Ct. App. Apr. 10, 2002).

       (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

4 Restatement (Second) of Torts § 822, at 108.

In support of its argument to overrule *Martins*, NNG notes that after *Martins*, the legislature amended section 657.1 to provide a comparative fault defense in actions to abate a nuisance against an electric utility. *See* 2004 Iowa Acts ch. 1077, § 1 (codified at Iowa Code § 657.1(2) (2005)). The relevant Code section now provides:

       2. Notwithstanding subsection 1, in an action to abate a nuisance against an electric utility, an electric utility may assert a defense of comparative fault as set out in section 668.3 if the electric utility demonstrates that in the course of providing electric services to its customers it has complied with engineering and safety standards as adopted by the utilities board of the department of commerce, and if the electric utility has secured all permits and approvals, as required by state law and local ordinances, necessary to perform activities alleged to constitute a nuisance.

Iowa Code § 657.1(2). NNG does not contend that it is an electric utility within the meaning of the statute. But it does contend that the statutory amendment evidenced the legislature's displeasure with allowing nuisance claims to proceed in stray voltage cases without considering concepts of negligence.

We decline NNG's request to overrule *Martins* and adopt the dissenting position in *Martins* and Restatement (Second) of Torts section 822. The *Martins* dissent and Restatement (Second) of Torts section 822 are not in accord with our statutory nuisance scheme. As noted above, sections 657.1 and .2 allow an action for nuisance without proof of negligence and without proof of abnormally dangerous conditions. We are not at liberty to rewrite the statute. *See Thompson Wholesale Co. v. Frink*, 131 N.W.2d 779, 781 (Iowa 1964) ("It is not our function to rewrite these statutes."); *Koehler v. Hill*, 15 N.W. 609, 635 (Iowa 1883) ("The judiciary department of the government is charged with the duty and authority

of construing and applying the law which is made by the legislative department of the government. . . . As the judiciary cannot make laws (statutes)[,] they cannot unmake them.").

When the legislature wanted to import concepts of negligence and comparative fault into nuisance claims, it did so in the limited context of claims against electric utilities. In examining that targeted amendment made after *Martins*, "we are to be guided by the maxim 'expressio unius est exclusio alterius,'—expression of one thing is the exclusion of another. This expresses the well-established rules of statutory construction that legislative intent is expressed by omission as well as by inclusion, and the express mention of one thing implies the exclusion of others not so mentioned." *Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995) (citations omitted). Applying that maxim here, we can safely infer that the legislature's specific amendment involving only nuisance claims against electric utilities was not intended to import concepts of negligence and comparative fault for nuisance claims not involving electric utilities.

The *Martins* dissent and Restatement (Second) of Torts section 822 also are not in accord with our precedents. As discussed above, a long line of Iowa cases holds that nuisance can be proved without proof of negligence without regard to whether the nuisance involves an inherently dangerous activity. Indeed, in *Martins*, the court noted that Iowa had not adopted section 822 because Iowa's precedents are "contrary to the position of the Restatement (Second) of Torts section 822." 652 N.W.2d at 664 (majority opinion). We are bound by the doctrine of stare decisis to reject NNG's invitation to overrule our long-standing precedents. *See Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015) ("Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law.").

Finally, there is no reason to adopt Restatement (Second) of Torts section 822 because it will soon be superseded, and the revised Restatement is not in accord with NNG's proposed rule. The draft Restatement (Fourth) of Property provides that "[a]n actor is subject to liability to another for private nuisance if the actor engages in an activity, or is responsible for a condition, that substantially and unreasonably interferes in a nontrespassory manner with the use and enjoyment of land in the other's possession." 2 Restatement (Fourth) of Prop. § 2.1 (Am. L. Inst., Tentative Draft No. 3, 2022) [hereinafter Restatement (Fourth) of Prop.]. The drafters of the revised rule explained the distinction between nuisance and negligence:

> Negligence and nuisance are distinguished not only by the type of harm or setback that gives rise to liability, but also by the standard of conduct that each sets. Although the word "unreasonably" appears in the definition of nuisance, liability for nuisance is not conditioned—as it is for negligence—on proof that the defendant's conduct displayed insufficient *care*, *diligence*, or *prudence*. As noted, an activity that is performed without due care and that causes the requisite interference with use and enjoyment *may* constitute a private nuisance. However, the absence of carelessness on the part of an actor does not of itself defeat nuisance liability—an actor can act with due care yet still substantially and unreasonably interfere with another's use and enjoyment of his or her land. For example, the siting and operation of a factory might be done with due care, yet the owner/operator can still face nuisance liability if the factory generates unbearable odors that make neighboring residences uninhabitable.

*Id.* § 2.1 cmt. *d.* This comment in the draft Restatement (Fourth) of Property is consistent with Iowa law. We decline NNG's request to overrule *Martins* and adopt the Restatement (Second) of Torts section 822.

C.

The Vagts in this case asserted a claim for nuisance. Under the controlling statute and precedents, negligence is not an element of a nuisance claim. The jury in this case found that the stray voltage from the cathodic protection system

was definitely offensive, seriously annoying, and intolerable, that the stray voltage interfered with the Vagts' normal use of land in the local community, and that this constituted a nuisance. On the arguments presented, the district court did not err in rejecting NNG's proposed jury instruction and in denying NNG's motion for judgment notwithstanding the verdict or new trial.

III.

We next address the issue of damages. Special damages are available in nuisance actions. *Miller v. Rohling*, 720 N.W.2d 562, 569 (Iowa 2006). These special damages include the "personal inconvenience, annoyance, and discomfort caused by the existence of a nuisance." *Id.* (quoting *Weinhold*, 555 N.W.2d at 465). "There is no 'precise rule for ascertaining [special] damages'; the amount must be based upon the sound judgment of the fact finder giving impartial consideration to the evidence." *Id.* (alteration in original) (quoting *Weinhold*, 555 N.W.2d at 465). We will not disturb the jury's verdict on special damages so long as there is any reasonable foundation supporting the verdict:

> In the case of an action for an injury to the comfortable enjoyment of property by a person in possession, no precise rule for ascertaining the damage can be given, as, in the very nature of things, the subject-matter affected is not susceptible of exact measurement; therefore the jury are left to say what, in their judgment, the plaintiff ought to have in money, and what the defendant ought to pay, in view of the discomfort or annoyance to which the plaintiff and his family have been subjected by the nuisance; and whether the verdict is large or small, if, in view of the evidence, it has any reasonable foundation, it will not be disturbed because it is too small on the one hand, or too large on the other.

*Kriener v. Turkey Valley Cmty. Sch. Dist.*, 212 N.W.2d 526, 536–37 (Iowa 1973) (quoting *Boyd v. City of Oskaloosa*, 161 N.W. 491, 492 (Iowa 1917)). And, in making that determination, "we view the evidence in the light most favorable to the plaintiff." *Kuta v. Newberg*, 600 N.W.2d 280, 284 (Iowa 1999).

NNG argues the district court erred in denying its motion for remittitur or, in the alternative, motion for new trial. "Remittitur is an appropriate remedy when: '(1) the jury's damage award was not justified by the evidence before it; (2) the jury failed to respond to the evidence; or (3) the wrong measure of damages was applied.'" *Hoffmann v. Clark*, 975 N.W.2d 656, 669 (Iowa 2022) (quoting *WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 52 (Iowa 2008)). NNG contends that the jury's award of $1,250,000 for personal inconvenience, annoyance, and discomfort was lacking evidentiary support. NNG emphasizes that this case lacks the hallmarks of a true stand-alone nuisance case because the Vagts were never subjected to sensory offenses such as noxious odors that caused personal discomfort. The district court rejected NNG's argument, reasoning:

> Although this case does not involve personal injuries, there was testimony offered regarding Plaintiffs' mental distress. Joan Vagts testified how difficult it was to see her husband and son struggle running the dairy operation. When asked about having to shoot so many cows that could not recover from their ailments, Andrew Vagts became so choked up he could barely answer. The testimony was compelling. Additionally, in order to avoid even more economic losses, Plaintiffs had to engage in numerous time-consuming efforts. Had Plaintiffs not reduced their herd's somatic cell count, they could not have sold their milk for consumption.
>
> The Court does not find the damages awarded to be "flagrantly excessive or inadequate, [or] so out of reason as to shock the conscience or sense of justice, a result of passion, prejudice or other ulterior motive, or lacking in evidentiary support." *Hoffmann v. Clark*, 975 N.W.2d 656, 666 (Iowa 2022). The jury was attentive through seven days of trial. At no point did they appear outraged. The economic damages awarded were less than the Plaintiffs requested. Neither counsel suggested an appropriate number for non-economic damages. The fact that the non-economic damages are 58.33% of the economic damages does nothing to suggest a runaway jury. The Wisconsin Court of Appeals held that $1,000,000 in non-economic damages was not excessive in a stray voltage case with $750,000 in awarded non-economic damages. *Allen v. Wisconsin Pub. Serv. Corp.*, 694 N.W.2d 420 (Wis. Ct. App. 2005).

(Alteration in original.)

This court reviews the district court's denial of a motion for new trial or remittitur for an abuse of discretion. *WSH Props.*, 761 N.W.2d at 48–49. This standard is "our most deferential." *State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017). We accord deference to the ruling of the trial court because "the trial judge saw and heard the witnesses, observed the jury, and had before it all the incidents of trial before ruling on a motion for a new trial." *Est. of Pearson v. Interstate Power & Light Co.*, 700 N.W.2d 333, 345 (Iowa 2005); *see also Kuta*, 600 N.W.2d at 284 ("An abuse-of-discretion standard is appropriate because the trial court has had the advantage of seeing and hearing the evidence; in applying that standard, other cases are of limited value.").

We cannot conclude the district court abused its considerable discretion in denying NNG's motion for new trial or remittitur. Here, there is a reasonable foundation for the jury's verdict. The testimony showed that as the Vagts' herd became increasingly sick, the Vagts had to spend additional time and resources to manage and tend to the cows. The testimony showed their workdays lengthened considerably, extending to late in the night. *Cf. Norman v. Crow Wing Co-op. Power & Light Co.*, No. A15–0983, 2016 WL 687472, at * 6 (Minn. Ct. App. Feb. 22, 2016) (affirming $1.5 million jury verdict in stray voltage case where the farmers "had increased labor due to extra feces in the milking parlor and caring for sick cows, including forcing medication down the throats of the cows"); *Gumz v. N. States Power Co.*, 721 N.W.2d 515, 522 (Wis. Ct. App. 2006) ("However, the jury did hear evidence regarding the time and effort he put into attending to his dairy heard over the years due to the stray voltage, which is part of the compensable annoyance and inconvenience.").

In addition to increased time and labor and stress, the Vagts also experienced decreased enjoyment of their property due to the necessity of

euthanizing an abnormally high percentage of their dairy herd. An expert witness testified that a typical dairy herd would not experience a death rate of more than 5% in a given year. The death rate of the Vagts herd far exceeded that. In one year, the Vagts lost 17% of their herd. Mark Vagts testified about the impact of having to euthanize so many cows:

> Andrew shoots them with a deer slug and puts them down. You got to pick up that cow. You got to take her out and compost her. And it's terrible having to watch your son kill that many cows.

He continued:

> Q. Mr. Vagts, how has putting your cows down -- having 76 of them die this past year, for example, how has that affected your use and enjoyment of your property.
>
> A. You know, sometimes you get to the point you don't even want to get up in the morning because you don't know what you're going to find out there, you know? These are cows that we really like. We really like working with them. No. 2, I think Andrew's put down 27 cows I counted. 27 cows. That's like every other week you shoot your dog, you know? That has a lot of mental effect on a young man. I don't care who it is. It affects you when you have to put down that many cows.

Andrew Vagts testified:

> A. I don't like it at all. It's -- the hardest part of it is -- oh, man. This is not -- I don't know if I can do it. Well, one, they can't get away from the problem where the rest of us can. What really sucks is telling my kids why their fair calf had to be shot or put down or sold. I can't -- that's all I got for that one.
>
> Q. Has it -- it's obviously adversely affected your enjoyment of dairying. Is that a fair statement?
>
> A. Just a little bit.
>
> Q. Not in a positive. When you say "just a little bit," I assume that's a sarcastic response?
>
> A. It is. There's nothing fun about it. Yeah, it's a burden.

Veterinarian Andrew Johnson testified that he could hear in Mark's voice how painful it was to lose these animals:

> And when you look at these cow deaths, 70 percent of them are in early lactation, which is -- that's the worst thing you can do to a dairy. So when you think about this, they're losing these cows, not to mention as a veterinarian, nothing I hate worse than to euthanize a cow. And when they have to do it, it's got to be -- I don't know how Andrew does it. But it's got to be killing him to be able to go over there and kill a cow. I mean, but this is way out of the line.

The district court, like the jury, heard all of this evidence and more. Niether the district court, nor this court, should disturb the jury's verdict unless it is flagrantly excessive or inadequate or so out of reason so as to shock the conscience. *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017). This is because the jury's award of damages is owed great weight. *See Thornton v. Am. Interstate Ins.*, 940 N.W.2d 1, 14 (Iowa 2020) ("In evaluating whether there was substantial evidence to support the damages awarded by the jury, we must affirm the verdict to the greatest extent allowed by law."); *Whitlow v. McConnaha*, 935 N.W.2d 565, 569 (Iowa 2019) ("Generally, we are reluctant to interfere with a jury verdict . . . ." (quoting *Jack v. Booth*, 858 N.W.2d 711, 718 (Iowa 2015))); *Cowan v. Flannery*, 461 N.W.2d 155, 158 (Iowa 1990) ("It is not for us to invade the province of the jury." (quoting *Kautman v. Mar–Mac Cmty. Sch. Dist.*, 255 N.W.2d 146, 147 (Iowa 1977))). The jury's verdict is supported by the record when viewed in the light most favorable to the plaintiffs, and the district court did not abuse its discretion in declining to disturb it.

NNG next argues that the damages award was excessive in this case because there was an omission in the instruction and the verdict form. The verdict form provided:

QUESTION NO. 5:

a. What is the amount of damages for loss of use and enjoyment of land sustained by the Vagts after March 12, 2016?

b. What is the amount of economic damages sustained by the Vagts after March 12, 2016?

c. What is the amount of damages for personal inconvenience, annoyance and discomfort sustained by [the] Vagts after March 12, 2016?

The verdict form did not contain an "end date" for calculating damages. NNG contends that the parties agreed that the end date for calculating damages should have been January 30, 2023, and that end date should have been included in the instructions and the verdict form.

NNG made this same argument in its posttrial motion, and the district court concluded that any alleged error was waived because the instruction and verdict form were submitted without objection. We agree with the district court's analysis, and we conclude NNG's failure to timely object to the instruction also failed to preserve this issue for appeal. "Generally, . . . error in jury instructions is waived if not raised before closing arguments are made to the jury." *Olson v. BNSF Ry.*, 999 N.W.2d 289, 294 (Iowa 2023) (omission in original) (quoting *Olson v. Sumpter*, 728 N.W.2d 844, 848 (Iowa 2007)). "These preservation rules apply equally to challenges to the verdict form." *Id.* at 295. NNG did not timely object to the relevant jury instruction or verdict form, and the issue is not preserved for appeal.

IV.

For the reasons stated above, we affirm the judgment of the district court.

**AFFIRMED.**

Oxley, McDermott, and May, JJ., join this opinion, and Christensen, C.J., and Waterman and Mansfield, JJ., join as to part III. Mansfield, J., files an opinion concurring specially, in which Christensen, C.J., and Waterman, J., join.

#23–0537, *Vagts v.Northern Natural Gas Co.*

**MANSFIELD, Justice (concurring specially).**

I concur in the judgment as to part II of the court's opinion. This case should have gone to the jury only under a negligence-based theory because it does not fit the criteria for strict-liability nuisance. However, Northern Natural Gas (NNG) didn't raise the necessary arguments, and the district court ruled correctly given what was before it. NNG is not entitled to a new trial, but we should be careful not to expand the law of strict-liability nuisance contrary to our 170 years of precedent. As this case illustrates, strict liability is a very powerful litigation tool that can force one party to pay large sums of money to another party without proof of fault. In the vogue of protecting one property owner's rights, we should not unduly limit another property owner's rights. I write separately to emphasize when proof of negligence is required.

## I. Some Additional Facts Should Be Noted.

The majority glosses over some important facts. NNG has an easement from the Vagts to construct, maintain, and operate a gas pipeline.[3] In 1961, NNG also paid for and obtained an easement from the Vagts for a specific tract of land "to construct, maintain, and operate a cathodic unit, ground bed and appurtenances." At that time, the Vagts were already running a dairy farm, although not as large or as near to the pipeline as today. The easement specifically provided that NNG would pay "any damages which may arise to growing crops, trees, shrubbery, fences or buildings from the construction, maintenance or operation of such cathodic unit, ground bed and appurtenances thereto"—but there was no promise to pay for damages to livestock. No one contends that NNG exceeded the geographic boundaries of the easement. The

---

[3]Like the majority, I will use "the Vagts" as shorthand to refer to the entire Vagts family, including the brothers who started the dairy in the 1950s and their grandsons who run it today.

easement is an elongated strip of land that starts at the pipeline and runs east in the direction of the Vagts' dairy farm.

The Vagts' lawyer acknowledged at trial that "[t]here are precious few . . . instances where a gas pipeline or any kind of cross-country high pressure steel pipeline that has what's known as a cathodic protection system on it . . . also gets into the . . . barn floor." Indeed, it appears that for decades the Vagts' dairy farm and NNG's pipeline and cathodic protection system coexisted without difficulty.

Stray voltage isn't a problem for people, but it can be a problem for cows. The harm to the Vagts' dairy herd appears to have resulted from a confluence of factors. In 2013, NNG replaced its anode bed and increased the amount of current that was flowing through it. In 2017, the Vagts expanded their facility by adding buildings near the anode bed. The new construction included a rebar grid that was embedded in the concrete floor and that became charged by NNG's cathodic protection system. The trial evidence indicated that it was "pretty unusual" to have a modern dairy barn within a few hundred feet of an anode bed and its rectifier. The Vagts made the decision to expand their dairy operation in the vicinity of the anode bed and its rectifier.

There was minimal, if any, evidence that other dairy farms operated near the pipeline. At most, there was Mark Vagts' testimony about the situation some sixty years ago:

> Q. Mr. Vagts, when you were growing up on that farm before the pipeline went in, and even after, were there a lot of d[ai]ries in that area?
>
> A. Yes, very many dairies. Probably the majority of farms between West Union and Eldorado milk cows.
>
> Q. And primarily an agricultural area?

A. Very much so.

Prior to trial, the Vagts voluntarily dismissed their negligence claim against NNG, leaving only a strict-liability nuisance claim for damages. NNG then asked the district court to grant judgment as a matter of law on the ground that strict-liability nuisance was not available because there is no "inherent" danger in operating cathodic protection and therefore *Martins v. Interstate Power Co.*, 652 N.W.2d 657 (Iowa 2002), didn't apply. The district court concluded, I believe correctly, that it was bound to follow *Martins* and submitted the Vagts' case to the jury. During the trial itself, NNG mostly disputed causation and damages. At the conclusion of trial, the jury found that NNG had created a nuisance and awarded $4.75 million in damages.

**II. Strict-Liability Nuisance Is Not Available for Persons Engaged in Uses That Are Unusually Vulnerable.**

Strict-liability nuisance, properly understood, involves an activity that interferes with "ordinary use or enjoyment by the possessor." 2 Restatement (Fourth) of Prop. § 2.2(1) (Am. L. Inst., Tentative Draft No. 3, 2022) [hereinafter Restatement (Fourth) of Prop.]. That is, "uses that are idiosyncratic and unusually vulnerable to interference typically will not generate a nuisance claim." *Id.* cmt. *d.*

Nuisance requires harm "of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose." 4 Restatement (Second) of Torts § 821F, at 105 (Am. L. Inst. 1979) [hereinafter Restatement (Second) of Torts]. "Rights and privileges as to the use and enjoyment of land are based on the general standards of normal persons in the community and not on the standards of the individuals who happen to be there at the time." *Id.* § 821F cmt. *d*, at 106. "Thus an ordinary power line supplying electric current for household use does not create a

nuisance when it interferes by induction with highly sensitive electrical instruments operating in the vicinity." *Id.*

"The interference must be one that would interfere with the normal use and enjoyment of a normal person; the interference is not a nuisance if it interferes only with especially sensitive persons or uses." 2 Dan B. Dobbs, Paul T. Hayden, Ellen M. Bublick, *The Law of Torts* § 399, at 619 (2d ed. 2011).

The majority reads comment *d* to section 2.2 of the Restatement (Fourth) of Property selectively and incorrectly. It is true that "merely fleeting or trivial" uses of property cannot be the basis for a nuisance claim. 2 Restatement (Fourth) of Prop. § 2.2 cmt. *d.* But they aren't the only category of uses that are ineligible for strict-liability nuisance. The same is true of "unusually vulnerable" uses. *Id.*

**III. The Legislature's and the Majority's Examples of Strict-Liability Nuisance Involve Activities That Would Harm the Ordinary User of Property.**

Classic nuisance cases involve noxious odors, pollution, obstructions, houses where criminal conduct regularly occurs, flammable junk, weeds, and trees carrying Dutch elm disease. *See* Iowa Code § 657.2 (2021). These are the examples listed in Iowa Code section 657.2. *See id.* (listing the statutory nuisances recognized by Iowa law). They are all activities that would be highly objectionable to just about everyone.

The nuisance cases summarized by the majority fall into the same pattern. They involve (1) a ferry cable strung across a navigable river so as to block navigation, (2) a slaughterhouse operating in a residential neighborhood, (3) smoke and soot from a smokestack, (4) a butcher shop producing "noxious and offensive smells," (5) a creamery that dumped its "filthy refuse" into a stream and "so befouled and corrupted the waters as to poison the same and cause noxious and offensive odors," (6) a municipal sewage plant that produced

noxious odors, (7) molasses that polluted the well water, and (8) hog confinements that would "compost approximately 2500 dead pigs a year and store and spread approximately five million gallons of manure." *Steamboat "Globe" v. Kurtz*, 4 Greene 433, 433–34 (Iowa 1854); *Bushnell v. Robeson*, 17 N.W. 888, 889 (Iowa 1883); *Churchill v. Burlington Water Co.*, 62 N.W. 646, 646 (Iowa 1895); *Rhoades v. Cook*, 98 N.W. 122, 123 (Iowa 1904); *Bowman v. Humphrey*, 109 N.W. 714, 714 (Iowa 1906); *Ryan v. City of Emmetsburg*, 4 N.W.2d 435, 437–38 (Iowa 1942); *Iverson v. Vint*, 54 N.W.2d 494, 494–95 (Iowa 1952); *Simpson v. Kollasch*, 749 N.W.2d 671, 672–73 (Iowa 2008) (footnote omitted). Again, these activities would clearly bother any ordinary property owner who lived nearby.

**IV. *Martins v. Interstate Power Co.* Is an Aberration, Was Wrongly Decided, and Is Contrary to Other Jurisdictions' Stray-Voltage Decisions.**

The majority discusses one case that doesn't fit this pattern. That case is *Martins*, 652 N.W.2d 657. In *Martins*, we held that strict-liability nuisance law should apply to a claim that an electrical utility's stray voltage was harming a neighbor's dairy herd. *Id.* at 664–65. Stray voltage is not a typical nuisance situation. Unlike odors, pollution, and the like, stray voltage is not a problem for most property owners but only for those who own dairy herds. The *Martins* dissent concluded that the dairy farmers should have been required to prove negligence. *Id.* at 665–66 (Cady, J., dissenting). And our general assembly quickly overruled *Martins* by making a comparative fault defense available to electrical utilities. *See* 2004 Iowa Acts ch. 1077, § 1 (codified at Iowa Code § 657.1(2) (2005)). The present case arose because NNG operates a natural gas pipeline rather than an electric utility.

The majority acknowledges that *Martins* has conceptual flaws, which it attributes to a "stray sentence." But I think the problems with *Martins* run deeper.

For starters, the "stray sentence" identified by the majority happens to be the *Martins* holding. Specifically, *Martins* states, "The key for such a stand-alone claim of nuisance is that the degree of danger likely to result in damage must be inherent in the thing itself." *Martins*, 652 N.W.2d at 664 (majority opinion). As the majority correctly observes, this sentence is a non sequitur. It conflates "inherent danger" with "ultrahazardous activity." Stray voltage is an inherent danger of electricity, but that doesn't mean that the party responsible for the stray voltage is engaged in an ultrahazardous activity. *Cf. Davis v. L & W Constr. Co.*, 176 N.W.2d 223, 225 (Iowa 1970) (holding that blasting by use of dynamite is a hazardous activity subject to strict liability).

Burns are an inherent danger of fires, but that doesn't mean we subject anyone who has a fire to strict liability regardless of fault. An "inherent danger" in itself isn't a sufficient reason to apply strict liability.

Also, as noted by Justice Cady's dissent, but overlooked by today's majority, *Martins* overruled a stray voltage case we had decided just three years before, *Schlader v. Interstate Power Co.*, 591 N.W.2d 10 (Iowa 1999). *See Martins*, 652 N.W.2d at 666 (Cady, J., dissenting). In *Schlader*, we held that strict liability did not apply to a stray voltage claim. 591 N.W.2d at 12 ("The Schladers urge us to adopt a rule of strict liability against power companies regarding stray voltage. Strict liability does not arise merely because a public utility is involved."). The majority doesn't discuss *Schlader*.

*Martins* also is contrary to the stray-voltage decisions from other states. *See, e.g., Kuper v. Lincoln–Union Elec. Co.*, 557 N.W.2d 748, 762 (S.D. 1996) (holding that a stray-voltage claim should not have been submitted on a strict-

liability nuisance theory); *Vogel v. Grant–Lafayette Elec. Co-op.*, 548 N.W.2d 829, 836–37 (Wis. 1996) (holding that a stray-voltage claim had to be submitted under negligence unless it had knowledge that its stray voltage was causing problems for the dairy farm and continued). Indeed, the *Martins* majority acknowledged, "In none of these [out-of-state] cases was there any recovery on the sole theory of nuisance." *Martins*, 652 N.W.2d at 662 (majority opinion). *Martins* overcame those precedents by proceeding on a mistaken ultrahazardous activity theory. *See id.* at 664; *cf. Fletcher v. Conoco Pipe Line Co.*, 129 F. Supp. 2d 1255, 1261 (W.D. Mo. 2001) ("[T]he Court finds that, as a matter of law, the operation of a cathodically-protected petroleum pipeline is not an abnormally dangerous activity."). If there is a case other than *Martins* allowing a stray-voltage damages claim to proceed without proof of negligence, I'm not aware of it, and the majority doesn't cite it.[4]

**V. We Should Adhere to Our Own Rule that Specialized Harms Cannot Support a Strict-Liability Nuisance Claim.**

Typically, specialized harms are *not* enough to sustain a strict-liability nuisance claim. *See, e.g.,* Keith N. Hylton, The Economic Theory of Nuisance Law and Implications for Environmental Regulation, 58 Case W. Rsrv. L. Rev. 673, 686 (2008); Gregory C. Keating, *Nuisance as a Strict Liability Wrong*, 4 J. Tort L. 1, 23–24 (2012); Henry E. Smith, *Exclusion and Property Rules in the Law of Nuisance*, 90 Va. L. Rev. 965, 1004–05 (2004); Stewart E. Sterk, *Strict Liability and Negligence in Property Theory*, 160 U. Pa. L. Rev. 2129, 2147–49 (2012).

The reason is that there are *two* property owners—here the Vagts and NNG—each of whom have property rights. The Vagts have the right to use their

---

[4]To cite another example, breeding mink are unusually sensitive to noise and vibration. Courts have accordingly rejected strict-liability nuisance claims brought by mink farmers. *See, e.g., Foster v. Preston Mill Co.*, 268 P.2d 645, 648 (Wash. 1954) ("It is the exceedingly nervous disposition of mink, rather than the normal risks inherent in blasting operations, which therefore must, as a matter of sound policy, bear the responsibility for the loss here sustained.")

land to operate a dairy farm. NNG has the right to use its easement to operate a pipeline. In fact, NNG acquired its easement—and a second easement to install a cathodic protection system—from the Vagts. So you have two property owners with presumptively equal rights to use their property. Arguably, NNG has a superior right because the parties entered into a contract authorizing NNG to operate a cathodic protection system. Each of these owners plays an important role in our economy—the Vagts by supplying milk, and NNG by supplying natural gas.

Normally, we allow each of the property owners to carry on their respective activities, subject to a duty not to physically trespass on each other's property and to a duty of due care. An exception arises when a property owner engages in an activity that would cause harm and annoyance to an ordinary neighbor—as in the noise, soot, and odor cases. In that case, the law of strict-liability nuisance steps in.

Our nuisance caselaw apart from *Martins* is consistent with these sensible policies. In *Weinhold v. Wolff*, we quoted with approval Restatement (Second) of Torts § 821F comment *d* that a nuisance must be "definitely offensive, seriously annoying or intolerable" to "normal persons living in the community." 555 N.W.2d 454, 459 (Iowa 1996) (en banc) (quoting 4 Restatement (Second) of Torts § 821F cmt. *d*, at 106). It is not enough that "the idiosyncracies of the particular plaintiff may make it unendurable to him." *Id.* (quoting 4 Restatement (Second) of Torts § 821F cmt. *d*, at 106).

In *Guzman v. Des Moines Hotel Partners, Ltd. Partnership*, we held that a malfunctioning sprinkler system that sprayed water into the street was properly characterized as a "negligence-nuisance" case that should not have been submitted under a separate nuisance theory but only under a negligence theory. 489 N.W.2d 7, 9, 11 (Iowa 1992) (quoting *Awad v. McColgan*, 98 N.W.2d 571,

574 (Mich. 1959) (en banc), *overruled on other grounds by Mobil Oil Corp. v. Thorn*, 258 N.W.2d 30 (Mich. 1977)). We quoted one treatise's observation that

> [t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word "nuisance." It has meant all things to all people, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of any exact or comprehensive definition. Few terms have afforded so excellent an illustration of the familiar tendency of the courts to seize upon a catchword as a substitute for any analysis of a problem; the defendant's interference with the plaintiff's interests is characterized as a "nuisance," and there is nothing more to be said.

*Id.* at 10 (alteration in original) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 86, at 616–17 (5th ed. 1984)).

In *Page County Appliance Center, Inc. v. Honeywell, Inc.*, we addressed a claim that radiation from the defendant's computer had caused interference on the televisions being sold in the plaintiff's store. 347 N.W.2d 171, 174–75 (Iowa 1984). We said,

> When the alleged nuisance is claimed to be offensive to the person, courts apply the standard of "normal persons in a particular locality" to measure the existence of a nuisance. This normalcy standard also is applied where the use of property is claimed to be affected. "The plaintiff cannot, by devoting his own land to an unusually sensitive use, . . . make a nuisance out of conduct of the adjoining defendant which would otherwise be harmless."

*Id.* at 175 (omission in original) (citations omitted) (first quoting *Patz v. Farmegg Prods., Inc.,* 196 N.W.2d 557, 561 (Iowa 1972); then quoting William L. Prosser, *Handbook of the Law of Torts* § 87, at 579 (4th ed. 1971)). Only after concluding that televisions are "ubiquitous" did we sustain the nuisance theory. *Id.* at 176.

In *Soderburg v. Chicago, St. P., M. & O. Ry.*, we said, "The authorities are to the effect that mere annoyance resulting from an alleged nuisance is not

enough, but the injury must be tangible and productive of at least physical discomfort to persons of ordinary sensibilities." 149 N.W. 82, 84 (Iowa 1914).

The aberration that failed to apply the ordinary person standard was *Martins*, not all the other Iowa nuisance cases. *Martins* allowed a property owner to bring a strict-liability nuisance claim over an activity that interfered with a specialized use and enjoyment, not an ordinary person's use and enjoyment. Significantly, though, we did *not* decide *Martins* on the ground that the activity of the electric utility was a classic nuisance, the box that the majority tries to put *Martins* in today.

We should adhere to all the nuisance cases that preceded and succeeded *Martins*. Those cases make clear that a strict-liability nuisance has to involve activity that is unacceptable to the ordinary person. Otherwise, the common law insists on proof of negligence.

**VI. The Jury Verdict Should Nonetheless Be Affirmed.**

Although I disagree with some aspects of the majority's legal reasoning, I concur in the judgment based on the unique posture of this case. NNG didn't argue that a strict-liability nuisance theory was unavailable because of the specialized nature of the Vagts' use and the resulting harm. Although NNG's advocacy does not justify the majority's unprompted effort to redefine Iowa's strict-liability nuisance law, it also doesn't allow us to reverse for a new trial.

To begin with, the district court's instruction defining nuisance gave NNG a path to argue that there shouldn't be a finding of nuisance because the Vagts' problems resulted from a specialized use. The jury was told:

> The degree of harm is "significant" if normal persons in the community would regard the invasion as definitely offensive, seriously annoying or intolerable. If normal persons in the community would not regard the invasion as such, the invasion is

not a significant one, even though the idiosyncrasies of the Vagts may make it unendurable to them.

I believe this instruction could have been improved. It left it unclear whether the jury should decide (1) whether stray voltage would be "seriously annoying or intolerable" *in its effects on typical persons in the community* or (2) whether *the jury, as typical persons in the community, would regard* what happened in this case as "seriously annoying or intolerable." The first alternative is a fair summary of what strict-liability nuisance law requires; the second alternative simply describes what jurors do in every case when they apply the conscience of the community. The record is insufficient to show that typical persons in the community would have suffered seriously annoying or intolerable effects from stray voltage during the relevant time period. But a jury—given an open-ended authority to decide what is seriously annoying or intolerable—could have sided with the Vagts in this case.

Nevertheless, NNG didn't object to the instruction and it didn't try to utilize whatever path it provided. It didn't argue to the jury that the Vagts' specialized use and ensuing harms due to stray voltage fell outside the scope of strict-liability nuisance law. Likewise, it didn't make that argument when it sought judgment as a matter of law.

In similar fashion, NNG does not raise a specialized-use argument on appeal. In its opening brief, NNG posits a number of reasons why strict-liability nuisance shouldn't apply. First, cathodic protection systems are not inherently dangerous. Second, Restatement (Second) of Torts section 822—which requires proof of either intentional conduct or negligence—should be adopted. *See* 4 Restatement (Second) of Torts § 822, at 108. Third, federal pipeline safety regulations provide the appropriate standard of care.

Respectfully, I am not persuaded by these points. I do not favor adopting section 822 and its confusing distinction between intentional and unintentional nuisances which the proposed Restatement (Fourth) of Property criticizes and then rejects. *See* 2 Restatement (Fourth) of Property § 2.1 cmt. *e* ("[T]his Section and § 2.2 also reject § 822's bifurcation of nuisance into intentional and unintentional nuisances."). I do not think federal regulations preempt Iowa tort law. And, for reasons I've already explained, I think the inherent danger issue discussed in *Martins* is a red herring.

**VII. Conclusion.**

For the reasons stated, I cannot join the majority's discussion of Iowa nuisance law. I therefore concur in the result reached in part II of the court's opinion. I join part III of the court's opinion as to damages.

Christensen, C.J., and Waterman, J., join this special concurrence.